[Cite as *State v. Skerkavich*, 2019-Ohio-4973.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                :

    Plaintiff-Appellee,                    :

    v.                                                  :

WILLIAM SKERKAVICH,                  :

    Defendant-Appellant.                :

No. 105455

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** VACATED AND REMANDED
**RELEASED AND JOURNALIZED:** December 5, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-16-605780-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Aqueelah Jordan and Katherine E. Mullin, Assistant Prosecuting Attorneys, *for appellee.*

Dean A. Colovas, *for appellant.*

FRANK D. CELEBREZZE, JR., J.:

{¶ 1} Defendant-appellant, William Skerkavich ("appellant"), brings the instant appeal challenging his conviction for felonious assault. Specifically, appellant argues that the trial court abused its discretion by considering inadmissible and prejudicial evidence, questioned appellant in a confrontational

manner, and his conviction for felonious assault was based on insufficient evidence. After a thorough review of the record and law, this court vacates appellant's conviction and sentence and remands for further proceedings consistent with this opinion.

## I. Factual and Procedural History

{¶ 2} Appellant brings the instant appeal from Cuyahoga C.P. No. CR-16-605780-A, in which appellant was charged with one count of felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(1). The felonious assault charge resulted from an altercation between appellant and the victim, James Caraballo, where appellant kicked Caraballo in the mouth. Caraballo sought medical treatment the following day because his tooth was hanging by the gum. Caraballo ultimately had a dental procedure performed, and the tooth was removed.

{¶ 3} The altercation between Caraballo and appellant occurred on West 6th Street in downtown Cleveland. On Saturday April 2, 2016, appellant went out to the bars located on West 6th Street to celebrate his roommate's birthday. Appellant and some friends took a party bus to the West 6th Street area. As appellant was leaving the bars early Sunday morning, April 3, he encountered Caraballo. Caraballo went out to the West 6th area with his cousin, Evelio Cedeno, and two of Cedeno's female friends. Appellant knew Caraballo because they grew up in the same neighborhood in Cleveland. Appellant became upset upon seeing Caraballo because they had gotten into a fist fight as eighth graders, and Caraballo bested appellant in the fight.

{¶ 4} Upon seeing Caraballo walk down the street on the sidewalk, appellant yelled to Caraballo "do you remember me, you kicked my ass in the eighth grade?" Appellant then collected snow that had accumulated on the hood of a nearby car, and threw a snowball at Caraballo, striking Caraballo in the side of the face. Appellant again yelled to Caraballo "do you remember me, you kicked my ass in the eighth grade?" Appellant became enraged then charged at Caraballo. Caraballo, in an effort to protect himself, charged back at appellant. Appellant then punched Caraballo in the face. Caraballo fell to the ground and was unable to get back to his feet because the sidewalk pavement was icy. Appellant then kicked Caraballo in the head as he was on the ground. As a result, Caraballo was bleeding from the mouth and had a tooth hanging by the gum.

{¶ 5} The following day, Caraballo sought medical attention for the tooth, and it was removed and replaced with a fake tooth. While Caraballo was at the hospital being treated for the injury to his tooth, a Cleveland police officer took a report as to Caraballo's version of the events. It is unclear from the record whether Caraballo or hospital staff called the police to report the incident.

{¶ 6} Appellant was arraigned on the one-count indictment on May 6, 2016. Appellant pled not guilty to the indictment, and the matter proceeded to a bench trial. The bench trial commenced on December 12, 2016, and continued through the following day. The trial court found appellant guilty of felonious assault and continued the matter for sentencing. On January 10, 2017, the trial court sentenced

appellant to four years of community control sanctions. Appellant filed a notice of appeal on February 11, 2017.

{¶ 7} On March 13, 2017, this court dismissed appellant's appeal for failure to file a timely notice of appeal. (Motion No. 505309.) This court then on March 22, 2017 reinstated appellant's appeal. (Motion No. 505611.) Appellant failed to file an appellate brief, and this court dismissed appellant's appeal on June 16, 2017, pursuant to App.R. 18(C). (Motion No. 508001.) Appellant filed a motion for reconsideration of this court's dismissal, which was granted on June 20, 2017. On September 18, 2017, this court then again sua sponte dismissed appellant's appeal for failure to file a brief. (Motion No. 510372.)

{¶ 8} On January 17, 2019, appellant filed an application for reopening of his appeal pursuant to App.R. 26(B). This court then, sua sponte, issued an order to treat appellant's application for reopening as an application for reconsideration pursuant to App.R. 26(A), and granted appellant's motion.

{¶ 9} Appellant now brings the instant appeal and assigns three errors for our review:

I.    Whether [appellant] was denied due process of law by the trial court in a bench trial where the court was either, 1) predisposed in rendering its decision or, 2) otherwise abused its discretion by eliciting and considering inadmissible evidence, including but not limited to [appellant's] driving record, juvenile record, misdemeanor record and history of past acts in evaluating the credibility of witnesses, thus resulting in [appellant's] conviction[.]

II.   Whether the trial court abused its discretion by questioning [appellant] in a confrontational manner and/or by

misinterpreting testimony or relying on testimony not part of the record as part of the basis of its decision[.]

III.   Whether the trial court abused its discretion in determining that the actions of [appellant] rose to the level of felonious assault[.]

## II. Law and Analysis

{¶ 10} Appellant's first and second assignments of error pertain to questions posed to appellant by the trial court during the bench trial. We find appellant's second assignment of error dispositive of the instant appeal, and thus, we will address this assignment of error first.

{¶ 11} In appellant's second assignment of error, he argues that the trial court abused its discretion by questioning appellant in a confrontational manner. Appellant also argues that the trial court misinterpreted testimony and relied on testimony not a part of the record. In this way, we interpret appellant's arguments to mean that the trial court questioned appellant in a confrontational manner and, thus, demonstrated bias and prejudice and essentially became an advocate for the prosecution.

{¶ 12} As an initial matter, we note that pursuant to R.C. 2945.06, when a defendant waives his right to a jury trial and elects to be tried by the court, "any judge of the court in which the cause is pending shall proceed to hear, try, and determine the cause in accordance with the rules and in like manner as if the cause were being tried before a jury."

{¶ 13} With regard to the trial court's questioning of witnesses, a trial court, in either a bench trial or a jury trial and in accordance with Evid.R. 614(B), "may

interrogate witnesses, in an impartial manner, whether called by itself or by a party." Evid.R. 614(B). "This rule exists because the trial court has an 'obligation to control proceedings, to clarify ambiguities, and to take steps to insure substantial justice.'" *State v. Stadmire*, 8th Dist. Cuyahoga No. 81188, 2003-Ohio-873, ¶ 26, quoting *State v. Kay*, 12 Ohio App.2d 38, 49, 230 N.E.2d 652 (8th Dist.1967). Furthermore, and pursuant to Evid.R. 611(A), the trial court has discretion to control the flow of the trial. "'This control includes asking questions of the participants and the witnesses in a search for truth.'" *State v. Redon*, 8th Dist. Cuyahoga No. 92611, 2009-Ohio-5966, ¶ 8, quoting *State v. Prokos*, 91 Ohio App.3d 39, 44, 631 N.E.2d 684 (4th Dist.1993), citing Evid.R. 614.

{¶ 14} A trial court's powers pursuant to Evid.R. 611 and 614 are within its discretion. *Redon* at ¶ 8, citing *Prokos* at 44. Therefore, "'[a] court reviewing a trial court's interrogation of witnesses and comments must determine whether the trial court abused that discretion.'" *Redon* at *id*, quoting *Prokos* at 44, citing *State v. Davis*, 79 Ohio App.3d 450, 607 N.E.2d 543 (4th Dist.1992).

{¶ 15} "'A judge abuses his [or her] discretion when he [or she] plays the part of an advocate, but the rule is not so restrictive that [a] judge is not permitted to participate in a search for the truth.'" *Redon* at ¶ 11, quoting *State v. Kight*, 4th Dist. Jackson No. 682, 1992 Ohio App. LEXIS 4727 (Sept. 9, 1992). In this way, a trial court "may interrogate witnesses, in an impartial manner, whether called by itself or by a party." Evid.R. 614(B). Absent "'any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court acted

with impartiality [in propounding to the witness questions from the bench] in attempting to ascertain a material fact or to develop the truth.'" *State v. Baston*, 85 Ohio St.3d 418, 426, 709 N.E.2d 128 (1999), quoting *Jenkins v. Clark*, 7 Ohio App.3d 93, 98, 454 N.E.2d 541 (2d Dist.1992).

{¶ 16} However, "there are strict limits placed on the propriety of judicial questions of witnesses, lest the court by its inquiries give the appearance of favoring one side or the other." *Harper v. Roberts*, 2007-Ohio-5726, 879 N.E.2d 264, ¶ 7 (8th Dist.). With regard to a bench trial, "the court is 'accorded greater flexibility in questioning witnesses * * * [because] when there is no jury, there is no one to be prejudicially influenced by the judge's demeanor.'" *Sheflyand v. Schepis*, 8th Dist. Cuyahoga Nos. 95665 and 95667, 2011-Ohio-2040, ¶ 35, quoting *Mentor v. Brancatelli*, 11th Dist. Lake No. 97-L-011, 1997 Ohio App. LEXIS 5439, 10 (Dec. 5, 1997).

{¶ 17} In appellant's second assignment of error, he takes issue with the trial court's questions posed to him. Appellant argues that his due process rights were violated because the trial court abandoned its duty of impartiality.

{¶ 18} In our review of the record, we note that the facts of the case were very straightforward, and the indictment consisted of one count of felonious assault. Indeed, the state was tasked with presenting evidence that demonstrated beyond a reasonable doubt that appellant "knowingly caused serious physical harm to" Caraballo. R.C. 2903.11(A)(1). Furthermore, appellant's trial counsel presented the argument that Caraballo had charged at appellant and that appellant was acting in

self-defense. Therefore, the issue at trial was whether or not a snowball was thrown at Caraballo, and whether or not appellant made provoking statements to Caraballo. In this way, the trial hinged on whether or not Caraballo was the initial aggressor, i.e., whether or not Caraballo charged at appellant unprovoked by a snowball or appellant's statements.

{¶ 19} In our review of the trial transcript, we note that appellant's direct examination spanned 14 pages. Appellant's counsel asked appellant approximately 70 questions. Conversely, the prosecutor's cross-examination of appellant spanned four pages of the trial transcript and the prosecutor asked appellant 22 questions. After appellant's counsel stated that he had no redirect questions for appellant, the trial court asked appellant approximately 85 questions. Indeed, this questioning by the trial court spanned over 22 pages of transcript wherein the entirety of the trial testimony spanned approximately 150 pages.

{¶ 20} Further, the only other witness in which the trial court engaged in a line of questioning with was Caraballo. The trial court asked Caraballo approximately 15 questions, which all focused on whether or not Caraballo saw appellant throw the snowball, and the circumstances of the previous fight between Caraballo and appellant when they were eighth graders.

{¶ 21} The entirety of the trial court's questioning of appellant is as follows:

THE COURT: Let me ask you a question. Take the stand again, if you would be so kind. So how many people were on the party bus?

[APPELLANT]: Around 10, 12, maybe.

THE COURT: Male or female?

[APPELLANT]: Male and female.

THE COURT: A keg of beer on the party bus?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: I'm sorry, I didn't hear the question.

THE COURT: A keg of beer.

[APPELLANT]: Oh, keg of beer, I thought you said, like, beer on the bus. No.

THE COURT: Was there a keg of beer on the party bus?

[APPELLANT]: There was no keg of beer on the party bus.

THE COURT: Plenty of alcohol, right?

[APPELLANT]: There was alcohol on the bus.

THE COURT: And you were doing shots too, right?

[APPELLANT]: Yeah, I guess. I guess you could say they were doing shots. I didn't drink until we got to the club.

THE COURT: Let's talk about that. Now, you're the guy that likes to go out and party, because you got two DUIs, right?

[APPELLANT]: Yes, I have two DUIs.

THE COURT: The party bus, let's talk about this party bus. What was the name of the limousine company?

[APPELLANT]: I couldn't tell you.

THE COURT: Who arranged for the limousine?

[APPELLANT]: I'm pretty sure Dominic or his mother.

THE COURT: And you said it was $50 a head to get on?

[APPELLANT]: Yeah, like 50 bucks a person.

THE COURT: Why would you pay $50 a person if you're not going to be partying your keister off?

[APPELLANT]:  I mean, I'm sure it was like — it was for the majority of, like, everybody on there, make sure nobody were to get any DUIs or anything.

THE COURT:  No, but what I'm saying, if someone says to me, [h]ey, Judge, you don't want to drink and you're not really a drinker, because it interferes with your workout, but we're going to be on a party bus and it's $50 a person, come and join, I'd say, [h]ey, I don't want to do that because I don't drink that much.  And if I only have two beers, like you said you had two beers the whole evening, we're going to talk more about that later, that comes down to $25 a drink, doesn't it?

[APPELLANT]:  It does, yes, I guess.

THE COURT:  Let's back up.  When did you get on the party bus, and where did you get on the party bus?

[APPELLANT]:  We got on the party bus from our house.

THE COURT:  From our house.

[APPELLANT]:  Dominic was living with me at the time, we were roommates.

THE COURT:  Dominic was living with you at the time?

[APPELLANT]:  Yes.

THE COURT:  You were roommates?

[APPELLANT]:  Yes.

THE COURT:  So the party bus showed up at your house?

[APPELLANT]:  Yes.

THE COURT:  What time of day was that?

[APPELLANT]:  Probably 11:00.

THE COURT:  11 p.m.?

[APPELLANT]:  11 p.m., yes.

THE COURT:  Isn't that a little bit late to go out partying?

[APPELLANT]: No, because downtown, like, people usually go out around 11 or 12:00.

THE COURT: So you're going to go close the bar?

[APPELLANT]: Yes.

THE COURT: You pay 50 bucks to get on the party bus —

[APPELLANT]: It could have been 10:00, 10 to 11:00, right around there.

THE COURT: 50 bucks to get on the party bus. How many other people are on the party bus with you?

[APPELLANT]: Right, ten or twelve people.

THE COURT: You all paid 50 bucks and you're telling me that between 10 p.m. and 2 a.m. you had two beers?

[APPELLANT]: I'm saying on the party bus I maybe had one or two, but once we got to the club I wasn't drinking that much. I think I was arguing with my girlfriend. Whatever caused it that night, for whatever reason it was, I was not drinking that much.

THE COURT: So you might say you wasted your money.

[APPELLANT]: You could say that. I mean, I still —

THE COURT: Why have a party bus if you're not going to party?

[APPELLANT]: Yeah.

THE COURT: Right?

[APPELLANT]: Yes.

THE COURT: Arguing with your girlfriend?

[APPELLANT]: Yeah, we got — whatever it was. I think she was upset because there was some other girl there that I talked to in the past.

THE COURT: Do you argue with a lot of people?

[APPELLANT]: No. I would say I've been pretty well liked.

THE COURT: You say fights were a common occurrence when you were in grade school.

[APPELLANT]: I didn't say fights were common.

THE COURT: You said a hundred percent of the time. The question was, [d]o people get involved in fights in elementary school, and your answer was, [y]eah, a hundred percent of the time. What did you mean by that?

[APPELLANT]: Kids do fight when they're in grade school, or this and that, I have seen that. I went to Cleveland schools, I've witnessed kids fight in sixth grade.

THE COURT: So a hundred percent of your friends have been involved in fights; is that what you're saying to me?

[APPELLANT]: No, I'm saying that kids get into fights in grade school.

THE COURT: Well, we know that kids get into fights in grade school.

[APPELLANT]: That's what I was saying.

THE COURT: We know adults sometimes fight, couples sometimes fight. But when you say, [y]eah, a hundred percent of the time, that's your words, not mine —

[APPELLANT]: Right.

THE COURT: — what do you mean by a hundred percent of the time?

[APPELLANT]: I'm saying that fights occur where grade school kids fight, that's what I meant to say. Like I've witnessed kids fight a hundred percent of the time, like I've witnessed them fight.

THE COURT: How many fights have you been involved in?

[APPELLANT]: [I've] been involved in a couple fights.

THE COURT: A couple?

[APPELLANT]: I've been involved in a couple fights, yeah.

THE COURT: What's a couple, so we're clear?

[APPELLANT]:  Maybe five.  I don't know.

THE COURT:  Five fights.  How old are you?

[APPELLANT]:  23.

THE COURT:  Five fights.  I'm 63, I don't think I've been involved in more than two physical fights in my entire life.  Five fights by age 23.  When was the first fight?

[APPELLANT]:  I fought with my cousins growing up a lot.

THE COURT:  You fought with your cousins a lot?

[APPELLANT]:  I mean, with my cousins, I have older cousins and stuff, they picked on me and stuff.  I wouldn't say it's like full out grudge, but, I mean —

THE COURT:  How many times did you fight with your cousins?

[APPELLANT]:  I don't know, I couldn't tell you, I couldn't put a number on it, but a couple times.

THE COURT:  I mean, you know, if you had to estimate how many times you fought with your cousins, what would you say?

[APPELLANT]:  I would say right around there.  I couldn't tell you.

THE COURT:  I mean, less than a dozen?

[APPELLANT]:  Less than a dozen, yes.  None of them serious, like full out, like brawling.

THE COURT:  Okay, but how many times would you fight with your cousins?

[APPELLANT]:  Right, I would say just as much as anybody else who fights with their cousins.

THE COURT:  I don't fight with my cousins, so I can't tell you.

[APPELLANT]:  I would say under a dozen times.

THE COURT:  Under a dozen times.  So you want to say ten?

[APPELLANT]:  Sure.

THE COURT:  Now, you said you've been involved in five fights.

[APPELLANT]:  Like five actual fights.

THE COURT:  What's the second fight you were involved in?  Take your cousins out.  What's the second fight you were involved in?

[APPELLANT]:  Well, I'm trying to go back, thinking of all the fights I've been involved in.

THE COURT:  Were you involved — let's start in juvenile court.  Were you involved —

[APPELLANT]:  I've never been arrested for fighting or anything like that.

THE COURT:  Let me ask you a question.  Were you involved in juvenile court for assaultive behavior?

[APPELLANT]:  No.

THE COURT:  You were not?

[APPELLANT]:  No, not that I can think back.

THE COURT:  Had you been in juvenile court?

[APPELLANT]:  I went to juvenile court when I was — I stole from the mall when I was 15 years old and, like, I made a poor decision to try to run away from the security guard and I got tackled, but I —

THE COURT:  In fact, if I am not mistaken, you were charged with robbery, correct?

[APPELLANT]:  Yeah, I stole clothes from the mall.

THE COURT:  And when you were confronted by security —

[APPELLANT]:  Yes.

THE COURT:  — you assaulted the security officer?

[APPELLANT]:  I did not assault the security officer.

THE COURT:  You were charged with it in juvenile court.  That was the fourth count of your indictment charging you with robbery, attempting to inflict physical harm during or fleeing after a theft or felony.

[APPELLANT'S COUNSEL]:  Excuse me, Your Honor.  I respectfully must object to this line of questioning.

THE COURT:  I'm just — he opened the door.

[APPELLANT]:  I threw — when I was getting confronted by the security guards, I threw the bag at the security guard and I tried to run.  I made a poor decision.

THE COURT:  We'll call that your second fight, okay?  What was your third fight, because you testified you have been involved in five fights.

[APPELLANT]: I couldn't tell you.  I couldn't tell you going back.  [I've] been involved when I played football, we got into fights during practice where guys lash out and we get into fights and have our pads on, and afterwards we go back to practice.  [I've] never been involved in any serious fights where the police have needed to be called which I was getting charged with anything.  This is the only time something like this ever happened.  If there's ever been any other fights, it's been through football practice or something like that or with my family members or along those lines.  I have never been — I never struck anybody or hurt anybody to where the police needed to be called or anything like that.

THE COURT:  You're repeating yourself, okay?  You're repeating yourself.  There were ten people on the party bus?

[APPELLANT]:  Yes.

THE COURT:  How many men, how many women?

[APPELLANT]:  Maybe six men, four women.  I couldn't tell you exactly.

THE COURT:  And you saw the victim walking down the street, right?

[APPELLANT]:  Yeah, we seen [sic] each other when we walked past each other.

THE COURT:  According to your testimony, he was with whom?

[APPELLANT]:  He was with two other males.

THE COURT: What about the women, did you see a woman present?

[APPELLANT]: Right. I did not see any women present.

THE COURT: So you heard the testimony of Irene Csehi, C-S-E-H-I, she's the woman who testified via Skype, she testified to being there, to seeing this incident, to seeing you throw a snowball. Did you see her?

[APPELLANT]: I did not see her, no.

THE COURT: So are you suggesting she's making this all up?

[APPELLANT]: I'm suggesting that either she was so far away where I didn't see her, she was not in — like there was not two people in front. When they said there was two guys and two girls, that is a hundred percent false. I did not see her. Like when we were walking past, it was just the three guys. If she was all the way, like, up the street, that's the only way she could have witnessed anything.

THE COURT: So when you initially saw the alleged victim in the case, where were you at?

[APPELLANT]: We were crossing the street.

THE COURT: To go to the party bus?

[APPELLANT]: No, we were leaving the bus and we were going back over to Liquid to go pick up my girlfriend.

THE COURT: The one that you had the fight with?

[APPELLANT]: Yes.

THE COURT: Your fight with your girlfriend, did that involve throwing any punches?

[APPELLANT]: Absolutely not. It wasn't a physical fight.

THE COURT: Was she angry with you?

[APPELLANT]: I think she was just — she was angry at the fact that there was another girl there that I talked to or whatever.

THE COURT: Were you angry at her?

[APPELLANT]:  I was — I wouldn't say I was angry; I would say I was upset that she was mad.

THE COURT:  So you're going from the party bus to Liquid to get your girlfriend and you see the alleged victim, right?

[APPELLANT]:  Yes.

THE COURT:  Who addressed who first?

[APPELLANT]:  He said along the lines like, I beat this punk-a** b**** up, something along those lines, to his friend.  He was bragging about it to his friends as I walked by.

THE COURT:  How close were you to him?

[APPELLANT]:  We crossed each other and then that's when I turned around and I said something.

THE COURT:  What did you say?

[APPELLANT]:  I said, I'm not a b****, don't call me a b****, something along those lines, and he turned around and he said what he said.

THE COURT:  He's outnumbered at that point, because —

[APPELLANT]:  No, he was not outnumbered.

THE COURT:  He was with two buddies and you had five dudes with you.

[APPELLANT]:  No, I had two, it was just me and Pedro with each other. Everybody else was on the bus.  Me and Pedro went back looking for Heather.

THE COURT:  And you tell me that you see this guy at the health club regularly, right?

[APPELLANT]:  I do.

THE COURT:  And instead of, you know, the same kind of conversation at the health club, all of a sudden he's threatening you or saying these pejorative —

[APPELLANT]:  I don't know if he was trying to, like, brag or whatever because he was with his friends trying to look cool, or because he was drunk, or whatever it was.

THE COURT:  How about the witnesses that testified that you threw a snowball and hit him in the face?

[APPELLANT]:  I didn't throw no snowball or hit him in the face.

THE COURT:  So they just completely made that stuff up?

[APPELLANT]:  I don't know if it was made up, just to say I started it because he said he charged at me.  I don't know if that's why it was said, but —

THE COURT:  What do you do for a living?

[APPELLANT]:  I landscape with my cousin during the summer.  And then hopefully —

THE COURT:  What do you do during the winter?

[APPELLANT]:  I want to start plowing, but I have to go get the driving privileges.

THE COURT:  Where do you live?

[APPELLANT]:  I stay on 104th and Madison.

THE COURT:  With whom?

[APPELLANT]:  My mom and my dad.

THE COURT:  Is that your dad in the back of the courtroom?

[APPELLANT]:  Yes.

THE COURT:  Have you fought with your father?

[APPELLANT]:  No.

THE COURT:  Have you fought with your mother?

[APPELLANT]:  No.

THE COURT:  Have you been involved in AA, CA, or NA —

[APPELLANT]: No.

THE COURT: — when you were convicted for driving under the influence of alcohol?

[APPELLANT]: No, I got a year of inactive probation.

THE COURT: Did you at that point stop drinking?

[APPELLANT]: I would say I didn't drink for a while, yes. I was locked up for about two, two-and-a-half months after I got the DUI, because I was going to court for something else.

THE COURT: What was that?

[APPELLANT]: I was going to court for a felony in Pennsylvania and ended up, me and my lawyer ended up doing a plea out from a felony to a misdemeanor.

THE COURT: What was the original charge?

[APPELLANT]: Sexual imposition.

THE COURT: Did you do time in a local penal institution?

[APPELLANT]: What's that mean?

THE COURT: County jail.

[APPELLANT]: No, I was in the [w]orkhouse waiting to get extradited to Pennsylvania, but they let me bond out immediately once I got down there.

THE COURT: Did you plead to a felony in Pennsylvania?

[APPELLANT]: No, I did not, I pled out to a misdemeanor; otherwise, I was going to take it to trial.

THE COURT: Who was the alleged victim in that case?

[APPELLANT]: I couldn't tell you her name. I was at [an] Edinboro football camp and we were out there, we were drinking and —

THE COURT: I thought you told me you quit drinking.

[APPELLANT]: This is when I was 19, when I first — this is high school.

THE COURT: And you were indicted in Pennsylvania for a felony sexual abuse, you pled to a misdemeanor?

[APPELLANT]: Yes.

THE COURT: The alleged victim, do you know her name?

[APPELLANT]: I have no idea what her name is.

THE COURT: Did she raise allegations that you were violent?

[APPELLANT]: No.

THE COURT: Did she raise allegations that you forced her?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: Your Honor, I respectfully must object.

THE COURT: I'll sustain your objection at this point. So the [c]ourt's asked questions, I'll permit the [s]tate to follow up with any direct or cross-exam based upon those questions.

(Tr. 142-163.)

{¶ 22} In the instant case, the state presented four witnesses in the following order: Caraballo, a Cleveland police officer who took the initial report at the hospital when Caraballo was receiving medical treatment, Cedeno, and Cedeno's friend. As noted above, the trial court's questions posed to Caraballo were to clear up apparent ambiguities in Caraballo's testimony. The trial court was attempting to clear up ambiguous facts surrounding a pertinent issue — whether or not appellant threw a snowball at Caraballo. The trial court did not ask any questions of the state's other three witnesses.

{¶ 23} Appellant presented two witnesses in his defense in the following order: appellant's friend, Pedro Rodriguez, and then appellant. The trial court did

not pose any questions to Rodriguez. As noted above, the trial court posed approximately 85 questions to appellant. In reviewing these questions posed to appellant, the trial court was in no way attempting to clear up inconsistencies, contradictions, or ambiguities. Instead, the trial court took the stance of a biased advocate on the side of the prosecution.

{¶ 24} The term "'bias' 'implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.'" *In re Disqualification of O'Neill*, 100 Ohio St.3d 1232, 2002-Ohio-7479, 798 N.E.2d 17, ¶ 14, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 469, 132 N.E.2d 191 (1956). "[T]he threshold inquiry is whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the [trial] court's conduct falls demonstrably outside this range so as to constitute hostility or bias." *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 74, citing *McMillan v. Castro*, 405 F.3d 405, 410 (6th Cir.2005).

{¶ 25} Based on the record before this court, we find this to be a clear example of bias and prejudice on the part of the trial court. It is also clear that the trial court abandoned its duty as an impartial factfinder and interrogated appellant on matters, not only inadmissible, but wholly immaterial to the instant case.

{¶ 26} The state argues that because appellant did not properly object to the line of questioning by the trial court, he has not properly preserved the issue for our

review and has waived all but plain error. In reviewing the record, we note that appellant's counsel did object to the line of questioning regarding appellant's Pennsylvania conviction, and the trial court sustained the objection. The trial court's questioning of appellant then concluded. However, and notwithstanding any objection raised by appellant's counsel, because we find that the trial court was biased, we find this error to be structural. "'[A] structural error "transcends the criminal process" by depriving a defendant of those "basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair."'" *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 271 (Moyer, J., dissenting), quoting *United States v. Padilla*, 415 F.3d 211, 219, (1st Cir.2005), quoting *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). Indeed, "[t]he presence of a biased judge is structural error, which, if demonstrated, requires reversal." *Cepec* at ¶ 74, citing *State v. Sanders*, 92 Ohio St.3d 245, 278, 750 N.E.2d 90 (2001).

{¶ 27} Accordingly, appellant's second assignment of error is sustained.

{¶ 28} Based on our resolution as to appellant's second assignment of error, his first and third assignments of error are moot. Appellant's conviction and sentence are vacated.

{¶ 29} Judgment vacated. Case is ordered to be returned to the administrative judge and reassigned.

It is ordered that appellant recover of said appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., JUDGE

KATHLEEN ANN KEOUGH, J., CONCURS;
MARY EILEEN KILBANE, A.J., CONCURS IN JUDGMENT ONLY