[Cite as *State v. Bias*, 2022-Ohio-4643.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 21AP-329 |
| v. | : | (C.P.C. No. 17CR-7003) |
| Devon D. Bias, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 22, 2022

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert*.

**On brief:** *Dennis C. Belli*, for appellant. **Argued:** *Dennis C. Belli*.

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1}  Defendant-appellant, Devon D. Bias, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a bench trial.  For the following reasons, we affirm that judgment.

{¶ 2}  On December 28, 2017, appellant and co-defendant, Darnell Vinson, were indicted on four counts of murder in violation of R.C. 2903.02 (two purposeful and two felony murders), all unspecified felonies, one count of discharging a firearm at or into a habitation or school safety zone in violation of R.C. 2923.161, a second-degree felony, three counts of attempted murder in violation of R.C. 2923.02 as it relates to 2903.02, all  first-degree felonies, three counts of felonious assault in violation of R.C. 2903.11, all second-

degree felonies, and one count of having weapons while under disability ("WUD") in violation of R.C. 2923.13, a third-degree felony. All but the WUD count included firearm, drive-by shooting, and criminal gang activity specifications. The charges arose from the shooting deaths of Q.S. and S.C. and the attempted shooting deaths of Jaw.L., Jar.L., and E.B.[1] on December 4, 2017.

{¶ 3} Appellant and Vinson were tried separately. Appellant voluntarily waived his right to trial by jury and elected to be tried by the court.

{¶ 4} The bench trial commenced on April 19, 2021. The prosecution presented live testimony from several witnesses. Jaw.L. did not testify at trial; however, following an Evid.R. 804(B)(6) hearing conducted midway through the trial, the trial court admitted video recordings of statements made by Jaw.L. during two police interviews conducted shortly after the shootings. (State's Exs. Y-1, Y-2.) By agreement of the parties, the prosecution played selected portions of those interviews. (State's Exs. Y, Y-1, Y-2.)

{¶ 5} In the interviews, Jaw.L. averred that sometime after 9:15 a.m. on December 4, 2017, he and his passengers, Jar.L., Q.S. and E.B., were driving around the Hilltop area in Columbus in a Honda CR-V. Jaw.L. observed a gray Chevy Malibu with dark-tinted windows and expensive-looking wheel rims directly ahead of him. Jaw.L. had seen the car in the area many times. Jaw.L. followed the Malibu for about one block and then unsuccessfully attempted to turn onto another street. At that point, the Malibu abruptly stopped; a person leaned out of the passenger side window and began shooting at the CR-V with a semi-automatic rifle. Jaw.L. described the shooter as a thin, African American male with "dark skin" and "chin hair," wearing a black hoodie and "a hat, a black skull cap type thing." (Jan. 3, 2018 Tr. at 480; State's Ex. Y-2.) Jaw.L had never seen the shooter before; however, he got a glimpse of his face and noted that his complexion was a shade or two darker than his own.[2] Jaw.L. demonstrated how the shooter leaned out of the window and propped his gun on top of the Malibu. He averred that when bullets began hitting the CR-V, Q.S. grabbed him, pushed his head down and told him to unlock the door. As Q.S. exited the car, he was shot in the neck; he ran away and eventually collapsed in an

---

[1] Jaw.L. and Jar.L. are brothers. At the time of the shootings, Q.S., Jaw.L., Jar.L., and E.B. were minors; S.C. was an adult. We initialize all their names to protect their identities.

[2] Jaw.L. is also African American.

alley. The shooting continued as Jaw.L., Jar.L., and E.B. ran away. Jaw.L. thought the shooter might be a member of the Hot Boys, a criminal gang operating on the west side of Columbus. Jaw.L. speculated that the shooter knew who he was and targeted him because he thought Jaw.L. was intentionally following the Malibu.

{¶ 6} Bradley H. Foss, a Columbus Division of Police ("CDP") patrol officer, testified that he was dispatched to the scene at approximately 9:30 a.m. Upon arrival, Foss observed the CR-V stopped in the middle of the intersection of Ray Street and South Wayne Avenue ("South Wayne"). The CR-V was unoccupied, but the engine was still running. Upon closer inspection, Foss noted broken windows, multiple bullet holes, and a significant amount of blood in the back seat. A blood trail leading away from the CR-V signaled to Foss that someone had been shot inside the CR-V and then exited on foot. Foss located numerous shell casings—fired from both an automatic rifle and a handgun—on the ground near the CR-V.

{¶ 7} Shortly thereafter, patrol officers Todd Aiello and Michael Ryan arrived at the scene. Aiello testified that area residents directed them to an alley near South Wayne, where a young African American male, later identified as Q.S., lay on the ground with a gunshot wound to his neck. Q.S. was unconscious and bleeding profusely.[3] The officers canvassed the neighborhood, but found no one who had witnessed the shooting.

{¶ 8} Crime Scene Search Unit ("CSSU") Detective Donald K. Jones testified that he collected evidence and took photographs at the scene. During this process, Jones noticed several bullet holes in the front section of a house located at 215 South Wayne, near where the CR-V was stopped. Through the front window, Jones observed bullet strikes in a wall and a gunshot victim, later identified as S.C., on the floor of the living room.[4]

{¶ 9} Photographs taken by Jones depict multiple bullet strikes to the CR-V, a blood trail leading from the CR-V to the alley where Q.S. was found, multiple bullet strikes to the front and interior of the house where S.C. was found, multiple 7.62x39 millimeter and .40 caliber shell casings near the CR-V, and a hat found in the street near the scene.

---

[3] Q.S. was transported to the hospital, where he later died. The Franklin County Coroner determined Q.S.'s cause of death to be a gunshot wound to the neck. (State's Ex. Q; Joint Stip. Ex. 3.)

[4] S.C. was pronounced dead at the scene. The Franklin County Coroner determined that S.C. died of a gunshot wound to the chest. (State's Ex. R; Joint Stip. Ex. 4.)

(Apr. 19, 2021 Tr. at 165; State's Ex. B.) At trial, Jones described the hat as "clean" and not "weathered," which suggested to him that it had not been in the street very long. (Tr. at 153, 154.) CSSU collected numerous items, including, as relevant here, seventeen .40 caliber shell casings, thirteen 7.62x39 shell casings,[5] and a "black/gray knit hat," from the Wayne Avenue area, and six projectiles and two bullet fragments from 215 South Wayne Avenue. (State's Ex. B and C-234).

{¶ 10} Robbie Thompson testified that he was outside working in the vicinity at the time of the shooting. He heard what he thought were multiple gunshots—"like a pack of fireworks going off"—and then observed a gray Chevy Malibu with temporary license tags "flying" down the street. (Tr. at 187, 191.) Thompson saw the occupants of the Malibu, whom he described as two "younger" African American males, only for a few seconds; as such, he could not identify them. *Id.* at 187. Later that evening, after seeing a news report about the murders, he called the police and reported what he had seen and heard.

{¶ 11} Homicide Detectives Melissa Carlson[6] and Anne Novotny[7] testified that they obtained surveillance camera video from a business located near the scene of the shootings. (State's Ex. L, L-1, L-2, L-3, L-4; Joint Stip. Ex. 2). Criminal Intelligence Analyst Amber Gill testified that she examined the surveillance video, which depicts a Honda CR-V following a gray Chevy Malibu with 30-day temporary license tags and a white front dealership placard at approximately 9:26 a.m. on December 4, 2017. (Tr. at 203; State's Ex. L, L-1, L-2, L-3, L-4.)

{¶ 12} Carlson also testified about Jaw.L.'s police interviews. To that end, she averred that she asked Jaw.L. for the names of any persons with whom he had conflicts. Jaw.L. provided the names of several members of the Hot Boys gang. (Tr, at 485, 539; State's Ex. Y-2.) Carlson testified that Jaw.L. did not indicate that these individuals were involved in the shootings; rather, he stated several times that he had never seen the person who shot him. (Tr. at 542; State's Ex. Y-2.) Upon investigation, Carlson found no

---

[5] The 7.62x39 mm shell casings were fired from the same firearm. (Joint Stip. Ex. 8).

[6] Detective Carlson lead the investigation; she retired in 2020.

[7] At the time of the investigation, Detective Novotny's surname, as reflected in relevant CDP documentation, was Pennington; she retired in 2020.

connection between the named individuals and the shootings; she admitted, however, that she did not prepare a written summary of her investigation into those individuals.

{¶ 13} Detective Lowell Smittle from the Narcotics Bureau Criminal Intelligence Unit ("CIU") testified that on December 11, 2017, he received information leading to the discovery of a gray Chevy Malibu with 30-day temporary tags and a front white dealership placard on East Barthman Avenue. Following its impoundment, the Malibu was photographed and processed by CSSU. The photographs depict a bullet strike above the window on the rear passenger side of the vehicle and fragments of a bullet found inside the vehicle. (Tr. at 366-371; State's Ex. J-7 through J-20.) According to Smittle, the bullet had been fired from the front passenger side toward the rear of the Malibu. The bullet fragments were recovered and analyzed; however, their irregular shape precluded any determination as to the source of their firing. (Tr. at 371; State's Ex. K, K-1, K-2, K-3.) No DNA or fingerprints were recovered from the Malibu.

{¶ 14} Gill determined that the Malibu recovered from Barthman was the same one depicted in the surveillance video. She further determined that the vehicle was registered to Vinson's girlfriend, Shakiyla Kendrick.

{¶ 15} CDP traced Kendrick to a residence on Mayfair Boulevard. (Joint Stip. Ex. 7.) On December 12, 2017, SWAT Officer Mark Aurentz observed Kendrick and Angel Watkins leave the residence and place two bags in the trunk and backseat of a car. *Id.* After Watkins, the car's owner, signed a consent to search form, Carlson and Novotny recovered the bags from the vehicle. (State's Ex. F-53; Joint Stip. Ex. 7.) CSSU Sergeant Joseph Donovan photographed the bags and transported them to the CSSU laboratory for processing. (State's Ex. F; Joint Stip. Exs. 1 and 7.) Pursuant to a search warrant, and as relevant here, CDP recovered a Glock .40 caliber pistol, a .40 caliber magazine, and .40 caliber ammunition from the bags.

{¶ 16} Firearms examiner Erica Pattie testified that she compared a projectile recovered from S.C.'s body to test bullets fired from the .40 caliber Glock pistol. In her reported findings, Pattie opined that the projectile and the test bullets were fired from the same .40 caliber Glock pistol. (State's Ex. M-4.)

{¶ 17} DNA analyst Miranda Aufiero Smith testified that she obtained DNA from inside the hat recovered from the scene and from the firearm recovered from Kendrick's

car for comparison to DNA obtained from appellant[8] and Vinson. In her reported findings, Smith opined that the hat contained DNA from two individuals and that appellant could not be excluded as the major contributor. More particularly, Smith opined that "it is at least 292 octillion times more likely if Devon Bias is one of the contributors than if this were a mixture of two unknown, unrelated individuals." (Tr. at 310; State's Ex. N-1.) Smith further opined that Vinson could be excluded as a major contributor. As to the firearm, Smith opined that Vinson could not be excluded as the major contributor of DNA and that appellant could be excluded as a major contributor. On cross-examination, Smith acknowledged the possibility that unswabbed portions of the hat could contain DNA from another major contributor or that an individual who had been in contact with the hat did not leave any DNA.

{¶ 18} Pursuant to the Evid.R. 804(B)(6) hearing, the trial court also admitted an audiotape of Jaw.L.'s participation in a photo array procedure held on December 14, 2017. (State's Ex. Y-3). During that procedure, Jaw.L. was presented a six-person photo array. (State's Exs. O and Y-3.) Appellant's photograph appeared in the "#6" position. The photo array procedure was conducted by a blind administrator in accordance with CDP policy. During the procedure, Jaw.L. averred that he thought he had seen #6 somewhere before, but he could not be certain. He further averred, "I don't know why, but I feel like it's #6." (State's Ex. Y-3.) In response to the administrator's question as to whether Jaw.L. was able to say "it is, is not, or not sure," Jaw.L. averred, "I want to say it's #6, because when the dude came out [of] the car—he's just got his features. I got a glimpse of his face before I went down because I had a little time to look. * * * I don't want to accuse nobody, but I think it's #6." (State's Ex. Y-3.) When questioned about the shooter's actions, Jaw.L. explained that the shooter leaned out of the back seat passenger window, propped his gun on top of the car, and started shooting. According to Jaw.L., "[the shooter] took 4 or 5 seconds, so I got to look at his face a little bit before he started shooting." *Id.* In the "Viewer's Statement" section of the written photo array procedure form, the administrator summarized Jaw.L.'s statement, writing: "1, 2, 4, 6 look familiar. #6 came to back seat passenger window and started shooting [Q.S.] and another person was shot." Jaw.L. circled appellant's

---

[8] On January 19, 2018, Carlson obtained two oral swabs from appellant in order to provide a DNA standard for the CDP crime laboratory. (State's Ex. S ; Joint Stip. Ex. 5.)

photograph and identified "#6" as the shooter. (State's Exs. O and Y-3.) Jaw.L. thereafter told Carlson he was "positive" #6 was the shooter. (Tr. at 496; State's Ex. Y-3.)

{¶ 19} CIU Detective Smittle also testified about criminal gang activity in Columbus. To that end, Smittle averred that determination by law enforcement as to gang membership involves evaluation of several factors. One such factor—frequent documented association with known gang members—is typically determined through the use of police reports detailing criminal activity involving gang members, other police documentation showing a connection between gang members at specific times and locations such as funerals or other social gatherings, social media depictions of gang members together, and/or self-admission of gang affiliation to police officers during field interviews.

{¶ 20} Smittle noted that one of the major gangs in Columbus, known as the "Bloods," typically identify with the color red. Members often wear red clothing and hats and have tattoos and display hand gestures designating their affiliation with the Bloods.

{¶ 21} According to Smittle, in Columbus, the Bloods have affiliated "subsets," one of which is the Deuce Deuce Bloods. (Tr. at 335.) Smittle described the Deuce Deuce Bloods as a large gang with historical membership of over 100 active members and current active membership of approximately 16 individuals. The Deuce Deuce Bloods operate in the Livingston Avenue area in east Columbus and engage in criminal behavior including murder, robbery, drug trafficking, weapons possession, receiving stolen property, burglary, and rape.

{¶ 22} Smittle also testified about a subset of the Deuce Deuce Bloods known as the "Reckless Gang." *Id.* at 343. Two of its members, Stevphon Calloway and Daren Perry, were convicted in 2017 of, among other crimes, participating in a criminal gang. Smittle further averred that CDP has identified Vinson as a member of the Deuce Deuce Bloods through his social media accounts, photographs of him posing with other gang members, self-admission to CDP officers, and documented association with Calloway and Perry.

{¶ 23} Smittle further testified that he examined a "gang packet" documenting appellant's association with Vinson dating back to 2012. *Id.* at 347. The "gang packet" also includes Ohio Department of Rehabilitation and Correction ("ODRC") records from 2014 classifying appellant under the "STG Blood gang membership." *Id.* at 347-48. According to Smittle, such ODRC classification is one of the qualifiers CDP uses to designate an

individual as an "active" or "documented" gang member.  *Id.* at 348.  In addition, appellant's "gang packet" includes allegations of gun use, drug use, and drug trafficking by both Vinson and appellant, as well as photographs depicting appellant and Vinson together and/or appellant demonstrating his affiliation with the Deuce Deuce Bloods.

{¶ 24} Smittle identified six photographs which, in his opinion, demonstrated indicia of appellant's membership in the Deuce Deuce Bloods at the time of the shootings. State's Ex. P-1, obtained from a social media posting from July 13, 2016, depicts appellant in a hospital bed; both appellant and an unidentified African American male sitting next to appellant are displaying gang signs affiliated with the Deuce Deuce Bloods.  The posting includes the phrase "Errrythang Blood money."  (Tr. at 351; State's Ex. P-1.)  State's Ex. P-2, taken from a social media posting on August 16, 2016, portrays appellant posing with documented members of the Deuce Deuce Bloods; most, including appellant, are wearing red clothing.  State's Ex. P-4, mined  from a social media posting from January 15, 2017, shows appellant posing with numerous $100 bills and an automatic handgun.  According to Smittle, this posting demonstrates criminal gang activity in that appellant was "showing off" by posing with a weapon and cash.  (*Id.* at 353; State's Ex. P-4.)  Another photograph, State's Ex. P-5, shows appellant with the word "Blood" tattooed on the back of his left hand. (Tr. at 353; State's Ex. P-5.)  State's Ex. P-6 is a July 4, 2017 photograph of appellant posing with Vinson inside a market on Livingston Avenue.   Smittle noted that the market is in Deuce Deuce Bloods' territory and both appellant and Vinson are wearing red clothing.  The final photograph, State's Ex. P-7, taken from appellant's social media posting from January 9, 2016, shows appellant with two documented members of the Bloods.  The posting includes the phrase "Kooling with the gang." (Tr. at 355; State's Ex. P-7.)  According to Smittle, replacement of the letter "C" is a method employed by Bloods members to distinguish themselves from a rival gang, the Crips.

{¶ 25} In addition to the foregoing testimony, the parties stipulated, in relation to the WUD count, that in 2012, appellant was adjudicated a delinquent child for burglary and in 2017 was indicted for cocaine possession. (State's Ex. 6.)  Additionally, the prosecution moved to incorporate certain testimony[9] provided during the Evid.R. 804(B)(6) hearing as evidence of appellant's consciousness of guilt.  Noting the trial court's assertions at the

---

[9] We will provide a detailed recitation of that testimony in our discussion of the second assignment of error.

Evid.R. 804(B)(6) hearing that it would not consider this evidence at trial, defense counsel argued that he would have crafted his questions differently had he known the evidence would be used at trial. The trial court admitted the evidence, indicating that it would "give it whatever value I think is appropriate." (Tr. at 638.) The court then stated that it would allow defense counsel to proffer for the record any additional questions he would have posed related to that evidence. The record contains no proffer by defense counsel.

{¶ 26} Appellant did not testify and presented no witnesses. He produced evidence of a search warrant affidavit prepared by Carlson on December 19, 2017 related to the search of a residence in conjunction with an attempt to arrest appellant (Def.'s Ex. 4), and an ODRC photograph of Vinson from August 4, 2019 (Def.'s Ex. 5).

{¶ 27} At the conclusion of trial, the trial court found appellant guilty on all counts and specifications as indicted. At a sentencing hearing held on May 24, 2021, the trial court imposed an aggregate prison term of 35 years to life and ordered that sentence to be served concurrently to an aggregate five-year prison term imposed in other cases. The trial court memorialized the conviction and sentence in an amended judgment entry filed July 21, 2021.

{¶ 28} Appellant timely appeals, setting forth the following seven assignments of error:

> [I]. Defendant-appellant's convictions are not supported by sufficient evidence to satisfy the requirements of the due process clause of the Fourteenth Amendment to the United States Constitution; or, alternatively, are against the manifest weight of the evidence.
>
> [II]. The Admission of [Jaw.L.'s] police interviews and pretrial identification violated the rules of evidence and deprived defendant-appellant of his right to due process and confrontation under the Sixth and Fourteenth Amendments to the United States Constitution.
>
> [III]. The trial court's participation in a Crim.R. 16(F) certification hearing and initiation of its own investigation into defendant-appellant's alleged culpability for the unavailability of a state's witness deprived defendant-appellant of his rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

[IV]. The failure to disclose the trial judge's exposure to highly inflammatory and prejudicial allegations of gang involvement and witness intimidation during the Crim.R. 16(F) certification hearing prior to asking defendant-appellant to reaffirm his waiver of a jury trial invalidated the waiver and deprived him of his right to trial by jury under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section Five of the Ohio Constitution.

[V]. The admission of evidence regarding defendant-appellant's possession of an unrelated firearm, his alleged participation in a pattern of criminal gang activity and threats by anonymous third parties against a witness, violated the rules of evidence and deprived him of his Fourteenth Amendment right to due process and a fundamentally fair trial.

[VI]. The trial court failed in its duty to conduct the four-part analysis required by *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) when ruling on defendant-appellant's motion to dismiss for a violation of his Sixth and Fourteenth Amendment right to a speedy trial.

[VII]. Defendant-appellant was denied his right to the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, due to the combined prejudicial impact of several instances of deficient performance.

{¶ 29} In his first assignment of error, appellant contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree.

{¶ 30} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. "Sufficiency of the evidence is the legal standard that tests whether the evidence [introduced at trial] is legally adequate to support a verdict." *State v. Kurtz,* 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *Thompkins* at 386. Whether the evidence is legally sufficient to support a criminal conviction is a question of law, not fact. *Id.*, citing *Thompkins* at 386. In making that determination, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond

a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307 (1979).

{¶ 31} "In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction." *Kurtz* at ¶ 16, citing *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80. "The court essentially assumes the state's witnesses testified truthfully and determines whether that testimony satisfies each element of the crime." *State v. Davis,* 10th Dist. No. 18AP-921, 2019-Ohio-4692, ¶ 38, citing *State v. Bankston,* 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4.

{¶ 32} In contrast, a manifest weight of the evidence challenge requires a different analysis. The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *Thompkins* at 387. Although there may be sufficient evidence to support a judgment, an appellate court may nevertheless conclude that a judgment is against the manifest weight of the evidence. *Id.*

{¶ 33} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris,* 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387, citing *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 34} Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis, i.e., a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *State v. Braxton,* 10th Dist. No. 04AP-725, 2005-Ohio-2198, ¶ 15, citing *State v. Roberts,* 9th Dist. No. 96CA006462 (Sept. 17, 1997). "[T]hus, a determination that a conviction is supported by the weight of the evidence will also be

dispositive of the issue of sufficiency." *Id.*, citing *Roberts.* Accordingly, we will first examine whether appellant's convictions are supported by the manifest weight of the evidence. *State v. Sowell*, 10th Dist. No. 06AP-443, 2008-Ohio-3285, ¶ 89.

{¶ 35} Appellant does not contest the evidence establishing that on December 4, 2017, an individual filed multiple shots from the window of a gray Chevy Malibu at the occupants of a Honda CR-V traveling behind it and that the shooting ultimately resulted in the deaths of Q.S. and S.C. Save for the gang specifications, appellant does not argue that such evidence is insufficient to prove the elements of the offenses for which he was convicted. Rather, appellant argues that the prosecution failed to prove that he was the shooter. Specifically, appellant argues that the prosecution primarily relied on two pieces of evidence to establish that he was the shooter, i.e., Jaw.L.'s identification of him in the photo array and the presence of his DNA on the hat found on the ground near the scene. Appellant maintains that neither establish his identity as the shooter beyond a reasonable doubt.

{¶ 36} In a criminal matter, the prosecution must prove every element of the crime charged beyond a reasonable doubt, including the identity of the person who committed the crime. *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, ¶ 15; *State v. Johnson*, 9th Dist. No. 13CA010496, 2015-Ohio-1689, ¶ 13 (identity of the perpetrator is an essential element that must be proved beyond a reasonable doubt). As with any other element of a crime, identity of the perpetrator may be established by direct or circumstantial evidence. *State v. Watkins*, 10th Dist. No. 14AP-807, 2016-Ohio-1029, ¶ 22, citing *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 18. Direct evidence exists when a witness testifies about "a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from other evidence to the proposition that is offered to establish." *State v. Cassano*, 8th Dist. No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence, on the other hand, is the "proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." (Further citations omitted.) *State v. Wright,* 10th Dist. No. 18AP-770, 2019-Ohio-5201, ¶ 22, quoting *State v. Robinson,* 10th Dist. No. 17AP-5, 2018-Ohio-1809, ¶ 20. Direct and circumstantial evidence are of equal evidentiary value. *Robinson* at ¶ 20, citing *Jenks*, 61 Ohio St.3d at 272. "Although there are obvious differences between direct and

circumstantial evidence, those differences are irrelevant to the probative value of the evidence." *Cassano* at ¶ 13, citing *State v. Treesh,* 90 Ohio St.3d 460, 485 (2001).

{¶ 37} Here, Jaw.L.'s identification of appellant in the photo array constitutes direct evidence establishing appellant's identity as the shooter. "While identity is an element that must be proven by the state beyond a reasonable doubt, the credibility of witnesses and their degree of certainty in identification are matters affecting the weight of the evidence." *State v. Reed,* 10th Dist. No. 08AP-20, 2008-Ohio-6082, ¶ 48.

{¶ 38} Appellant challenges Jaw.L.'s photo array identification as unreliable. The factors that must be considered when evaluating reliability are: (1) the witness's opportunity to view the offender at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the offender; (4) the witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of time that has elapsed between the crime and the confrontation. *State v. Glenn-Coulverson,* 10th Dist. No. 16AP-265, 2017-Ohio-2671, ¶ 52, citing *State v. Monford,* 190 Ohio App.3d 38, 2010-Ohio-4732, ¶ 39 (10th Dist.).

{¶ 39} Here, Jaw.L. indicated during the photo array procedure, held ten days after the shootings, that he observed the shooter for 4 or 5 seconds before he began firing multiple shots at the CR-V. Appellant argues that Jaw.L.'s initial statements that photographs 1, 2, 4, and 6 "looked familiar," that he was uncertain whether he had seen #6 prior to the shooting, and that he could not explain why he believed #6 was the shooter demonstrate "a high degree of hesitation and uncertainty regarding his ability to identify the shooter." (Appellant's Am. Brief at 7.) However, later in the photo array procedure, Jaw.L. definitively identified #6 as the shooter and confirmed to Carlson that he was positive in his identification.

{¶ 40} Moreover, even if there was some hesitation or uncertainty in Jaw.L.'s identification, " '[a] witness need not be free from doubt when identifying the perpetrator of a crime.' " *State v. Tucker*, 10th Dist. No. 15AP-434, 2016-Ohio-1033, ¶ 13, quoting *State v. Cameron*, 10th Dist. No. 10AP-240, 2010-Ohio-6042, ¶ 31. " '[A factfinder is] not so susceptible that [it] cannot measure intelligently the weight of identification testimony that has some questionable feature.' " *State v. Coleman*, 10th Dist. No 99AP-1387 (Nov. 21, 2000), quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). Here, the trial court, as

finder of fact, was in the best position to assess the evidence offered at trial in finding Jaw.L.'s photo array identification testimony to be credible, and such determination is entitled to great deference from a reviewing court. *State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 37.

**{¶ 41}** Appellant also argues that Jaw.L.'s statements in his police interviews cast doubt on his photo array identification. Appellant first challenges Jaw.L.'s statement that he "got a glimpse" of the shooter's face when the shooter leaned out of the window brandishing a firearm. (Tr. at 691, 701.) Appellant asserts it was unlikely Jaw.L. ever saw the shooter's face, given his statement that he ducked down when the shooter leaned out the window. However, we note that Jaw.L. also averred that Q.S. pushed him down on the seat *after* the bullets began hitting the car's windows. Under this scenario, Jaw.L. could have seen the shooter's face in the seconds before Q.S. pushed him down. The trial court, as the trier of fact, was in the best position to assess these seemingly inconsistent statements and resolve or discount them accordingly. *State v. Nivens,* 10th Dist. No. 95APA09-1236, (May 28, 1996).

**{¶ 42}** Appellant next argues that he does not fit the physical description of the shooter Jaw.L. provided during his police interviews. Jaw.L. stated that the shooter was a shade or two darker than himself. Appellant argues that a comparison of Jaw.L.'s skin tone in the video recordings of the police interviews with photographs of appellant from the "gang packet" establishes that appellant has a lighter complexion than Jaw.L. We find no merit in such comparison, given that the video recordings and the "gang packet" photographs were taken at different times, in different settings, with different photographic equipment, and with different lightings. Moreover, the trial court viewed the video recordings of Jaw.L.'s interviews, saw the photographs of appellant included in the "gang packet," and, as trier of fact, was in the best position to assess this evidence and assign it whatever weight it deemed appropriate.

**{¶ 43}** Appellant next points to Jaw.L.'s averment regarding the shooter's possible involvement with the westside Hot Boys gang. Appellant notes Smittle's testimony about appellant's association with a different gang, the Deuce Deuce Bloods, and his testimony that Carlson never asked him to follow up on the Hot Boys. Appellant also maintains that

Carlson never investigated the members of the Hot Boys gang Jaw.L. mentioned in his police interviews.

{¶ 44} We note initially that Jaw.L.'s speculation about the Hot Boys appears to be based on the fact that he frequently saw the Malibu in Hot Boys' territory, i.e., the west side of Columbus; further, he mentioned the names of Hot Boys members only in response to Carlson's question about possible conflicts with others. In neither circumstance did he definitively state that the shooter was a member of the Hot Boys. Indeed, he stated that he had never seen the shooter before that day. Further, as to Carlson's alleged failure to investigate the Hot Boys, we note Carlson's testimony that she investigated the named individuals but found no connection between them and the shootings. To the extent appellant suggests that Carlson's investigation into the Hot Boys was inadequate, we note that there is no accepted standard procedure governing police investigation. *State v. Komora*, 11th Dist. No. 96-G-1994 (Apr. 4, 1997). Further, "[t]he weight to be given any failure by the police officers to employ adequate investigative techniques is for the [trier of fact] to determine." *Id.*, citing *State v. Larry*, 10th Dist. No. 95APA11-1418 (June 5, 1996).

{¶ 45} Finally, appellant argues that Jaw.L.'s statements to the police undermine his photo array identification because his description of the hat worn by the shooter, i.e., a "black skull cap type thing," (Tr. at 480; State's Ex. Y-1) does not match Carlson's description of the hat found at the scene, i.e, a "black beanie with gray trim" and "a gray fuzzy on top." (Tr. at 556-567; State's Ex. B-38.) We agree with the state that semantics regarding the precise description of the hat is far less important than the fact that Jaw.L. correctly described the shooter as wearing a hat. Further, the trial court heard Jaw.L.'s description of the hat, Carlson's description of the hat, and observed the hat at trial. (State's Ex. B.)

{¶ 46} Turning to appellant's specific contentions regarding the hat itself, he correctly notes that "[t]here was no direct evidence that the hat was left at the scene by one of the shooters." (Appellant's Am. Brief at 9.) However, circumstantial evidence establishes that fact. The hat was found in the street near the scene of the shootings, and Jones testified that it was "clean" and not "weathered," which suggested to him that it had not been in the street very long. In addition, other circumstantial evidence pertaining to the hat establishes that appellant was the shooter. Jaw.L. mentioned only one person firing shots out of the

window of the Malibu, and he described the shooter as wearing a hat. The trial court, as trier of fact, could thus infer that the shooter lost his hat while leaning out the window. Moreover, and more importantly, appellant's DNA was found on the hat. Smith, the DNA analyst, testified that the hat contained DNA from two individuals and that appellant could not be excluded as the major contributor. Indeed, Smith opined that it was at least "292 octillion times" more likely that appellant was only one of the contributors than if the mixture was from two unknown, unrelated individuals. She further opined that Vinson could be excluded as a major contributor. Appellant challenges the DNA evidence on grounds that Smith admitted that appellant was one of two contributors to the mixture of DNA found on the hat, that others could have come in contact with the hat without depositing their DNA, that unswabbed portions of the hat could contain DNA from another major contributor, and that the DNA testing process could not definitively demonstrate when a particular DNA specimen was deposited. The trial court, as trier of fact, was free to believe all, part, or none of Smith's testimony. *State v. Moore,* 10th Dist. No. 19AP-464, 2021-Ohio-1379, ¶ 34.

{¶ 47} Appellant's final argument under his first assignment of error is that the prosecution failed to prove the gang specifications attached to his convictions for murder, attempted murder, felonious assault, and discharging a firearm into a habitation. We disagree.

{¶ 48} Ohio's gang specification statute authorizes a trial court to impose an additional mandatory prison term of one, two, or three years upon an offender who commits a felony offense of violence "while participating in a criminal gang." R.C. 2941.142; 2929.14(G).

{¶ 49} R.C. 2923.41(A) defines "criminal gang" and provides:

> (A) "Criminal gang" means an ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply:
>
> (1) It has as one of its primary activities the commission of one or more of the offenses listed in division (B) of this section.
>
> (2) It has a common name or one or more common, identifying signs, symbols, or colors.

(3) The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity.

{¶ 50} Appellant does not dispute that the prosecution established through testimony that the Deuce Bloods meet the definition of "criminal gang" under R.C. 2923.41(A) or that he is a documented member of that criminal gang. Instead, appellant maintains that the prosecution failed to prove that the shootings were "gang related." Specifically, appellant asserts that "[c]ourts in other jurisdictions have construed gang penalty enhancement statutes as requiring some proof that the underlying offense was 'gang related' in order to survive constitutional scrutiny. * * * To avoid constitutional concerns, the Ohio gang specification statute must be construed as requiring that the underlying offense must be 'gang related.' " (Appellant's Am. Brief at 14-15.) Initially, we note that appellant did not raise a constitutional objection to the gang specifications at trial. " 'A constitutional issue not raised at trial "need not be heard for the first time on appeal." ' " *Glenn-Coulverson,* 10th Dist. No. 16AP-265, 2017-Ohio-2671, at ¶ 60, quoting *State v. Douglas,* 10th Dist. No. 09AP-111, 2009-Ohio-6659, ¶ 61, quoting *State v. Awan,* 22 Ohio St.3d 120 (1986), syllabus.

{¶ 51} Furthermore, appellant's argument requires that we adopt legal standards established in other jurisdictions. This court, however, is bound by legal principles established in this state by the General Assembly, the Supreme Court of Ohio, and our own decisions. Initially, we note that the General Assembly did not include the term "gang related" in the text of R.C. 2941.142(A). Further, this court has held that R.C. 2941.142(A) as written is constitutional. *State v. Hairston,* 10th Dist. No. 08AP-735, 2009-Ohio-2346, ¶ 55-56.

{¶ 52} In addition, this court has affirmed gang specification convictions without any reference to the underlying offense being "gang related." In *State v. Wade,* 10th Dist. No. 16AP-674, 2018-Ohio-976, Wade argued that the state failed to prove that he committed the crimes for which he was convicted "while participating in" the gang. *Id.* at ¶ 47. Wade maintained that proof of that element would require a nexus between the offenses and his gang membership. *Id.* In rejecting that argument, we noted the state's evidence establishing Wade's membership and participation in gang-related crime in which Wade was involved, photographs taken from social media websites depicting Wade with

other known gang members, displaying gang signs and holding firearms, and documentation regarding Wade's gang membership which included non-criminal incidents in which Wade frequented known gang hangouts or congregated with other gang members. *Id.* at ¶ 49. We stated:

> Evidence of this nature has been held sufficient, when considered in conjunction with the nature of the crime, to establish gang specifications. *See, e.g., State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 27; *State v. Dantzler*, 10th Dist. No. 14AP-907, 2015-Ohio-3641, ¶ 30; *State v. Peterson*, 10th Dist. No. 07AP-303, 2008-Ohio-2838, ¶ 80-81. The state was not required to present evidence indicating that Wade overtly declared that he was committing the crime while participating as a gang member, and the jury could draw the necessary inference based upon testimony, circumstantial evidence, and the nature of the crime.

*Id.* at ¶ 50.

{¶ 53} As in *Wade,* Smittle's testimony, when considered in conjunction with the nature of the crimes committed, sufficiently establishes the gang specifications. As noted earlier, Smittle testified that the Deuce Deuce Bloods have an active membership of approximately 16 persons and engage in criminal behavior including murder, robbery, drug trafficking, weapons possession, receiving stolen property, burglary, and rape. Members typically identify with the color red, incorporate that color into their apparel, and designate their membership using tattoos and hand signals. As to appellant's affiliation with the Deuce Deuce Bloods, Smittle testified that appellant's "gang packet" includes documentation of his long-time association with Vinson, a known Deuce Deuce Bloods gang member, appellant's participation in gang-related crimes, photographs depicting appellant wearing red clothing while associating with Vinson and other gang members, displaying Bloods gang signs and a Bloods tattoo on his hand, and using Bloods-associated language. Smittle also testified that past ODRC records classified appellant as a member of the Bloods.

{¶ 54} For the reasons set forth above, we cannot find that appellant's convictions for murder, attempted murder, felonious assault, discharging a weapon into a habitation, and WUD, and the attendant specifications, including the gang specifications, were not supported by sufficient evidence or were against the manifest weight of the evidence.

{¶ 55} The first assignment of error is overruled.

{¶ 56} In his second assignment of error, appellant contends that the trial court erred in admitting the video recordings of Jaw.L.'s statements to the police. More particularly, appellant maintains the statements were not admissible under Evid.R. 804(B)(6) and that such evidence violated his Sixth Amendment right to confront the witnesses against him. Appellant also claims that the trial court erred in overruling his motion to suppress Jaw.L.'s photo array identification. We disagree.

{¶ 57} We first address appellant's contentions pertaining to the admission of the video recordings of Jaw.L.'s statements to the police. Initially, we note that " '[b]ecause testimony may be admissible under the Confrontation Clause yet inadmissible under the rules of evidence, and vice versa, the declarant's statements must fall within the constitutional requirements *and* the rules of evidence to be admissible.' " (Emphasis sic.) *State v. Miller*, 9th Dist. No. 14CA010556, 2016-Ohio-4993, ¶ 11, quoting *State v. Nevins*, 171 Ohio App.3d 97, 2007-Ohio-1511, ¶ 36 (2d Dist.) As a result, we consider appellant's evidentiary and constitutional challenges to the admission of Jaw.L.'s statements separately. *See State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 84, 103 (considering first whether challenged out-of-court statements were admissible under Evid.R. 804(B)(6) and second whether their introduction was consistent with the Confrontation Clause).

{¶ 58} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay statements are inadmissible except as otherwise provided in the Ohio Rules of Evidence or other relevant constitutional or statutory provisions. Evid.R. 802. Here, the trial court allowed Jaw.L.'s hearsay statements to be offered against appellant pursuant to the forfeiture by wrongdoing exception set forth in Evid.R. 804(B)(6). That rule provides in part:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> **Forfeiture by wrongdoing.** A statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying.

(Emphasis sic.)

{¶ 59} Forfeiture by wrongdoing is an equitable exception to a defendant's constitutional right to confront the witnesses against him. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 96, citing *Giles v. California*, 554 U.S. 353, 366 (2008). The doctrine is codified in Evid.R. 804(B)(6), which permits the prosecution to use hearsay statements of an unavailable witness if the prosecution can show by a preponderance of the evidence that "(1) the defendant engaged in wrongdoing that caused the witness to be unavailable and (2) one purpose for the wrongdoing was to make the witness unavailable to testify." *McKelton* at ¶ 96, citing *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 106, and *Hand* at ¶ 84. The prosecution need not establish that the defendant's sole purpose was to prevent the witness from testifying; it need only show that the defendant's wrongdoing which caused the witness's unavailability "was motivated in part by a desire to silence the witness." *Hand* at ¶ 84, 90.

{¶ 60} Although a trial court's hearsay rulings are generally reviewed for an abuse of discretion, "we review de novo evidentiary rulings that implicate the Confrontation Clause." *McKelton* at ¶ 97, citing *United States v. Henderson,* 626 F.3d 326, 333 (6th Cir.2010).

{¶ 61} At the prosecutor's request, the trial court conducted an Evid.R. 804(B)(6) hearing relative to Jaw.L.'s unavailability to testify at trial. At the outset of that hearing, the court averred that "[n]one of this will be used to impeach the defendant or anything else like that. This is strictly for the purposes of determining availability and the causation. At least that's how I understand it." (Apr. 21, 2021 Mot. Hearing Tr. at 4.) In addition, the court stated, "I just wanted to make sure that the defendant understood that the purpose of this [hearing] is to determine this initial question. * * * [I]t's not necessarily attacking his character or anything. * * * It's whether or not you have sufficient reasons to permit me to exercise the exception [to the hearsay rule]." *Id.* at 5.

{¶ 62} Prior to calling his first witness, the prosecutor proffered for the record the events that led to the filing of the request for an Evid.R. 804(B)(6) hearing. To that end, the prosecutor recounted that on the first day of trial, he received information that Jaw.L. had received death threats related to his impending testimony; the trial court gave the prosecutor time to place Jaw.L. in protective custody. The prosecutor further related that he told defense counsel that Jaw.L. was cooperative and ready to testify, but he did not want defense counsel to share that information with appellant due to concerns for Jaw.L.'s safety.

{¶ 63} Following this proffer, the trial court, addressing defense counsel, stated: "I want to make one thing clear. * * * Normally if we were in a jury trial, I would have the jury exit and we would do this hearing. Since I'm both trier of fact and judge, I can separate the two. So this is like a mini hearing inside of a trial, and I wanted to make sure your client understood that * * * [i]t's not going to be judged in his case in chief." (Mot. Hearing Tr. at 8-9.) Defense counsel averred that he had informed appellant that the evidence presented at the hearing would not be used by the court in determining his guilt or innocence. The court reiterated that the evidence "[is] not being used on the score card * * * on the trial. It's strictly to deal with evidentiary issues." *Id.* at 9.

{¶ 64} Following this preliminary discussion, the prosecutor presented the following evidence.

{¶ 65} Shelley Hughes testified that she was Jaw.L.'s former juvenile probation officer. As such, she was well-acquainted with Jaw.L. and remained in contact with him after he was released from probation. At the prosecutor's request, Hughes contacted Jaw.L and urged him to cooperate with the prosecution's investigation into the shootings. Jaw.L. met with prosecutors and provided his version of the events of December 4, 2017. The case was eventually set for trial on April 19, 2021. On March 4, 2021, prosecutors again met with Jaw.L.; at his request, Hughes sat in on the meeting. Prosecutors told Jaw.L. that a subpoena would issue compelling his testimony at trial and that failure to comply with the subpoena would result in the issuance of a warrant for his arrest. According to Hughes, Jaw.L. understood the consequences of his failure to honor the subpoena and was cooperative and willing to testify.

{¶ 66} On April 4, 2021, Hughes informed prosecutors that Jaw.L. told her he had received some "indirect threats" through social media. *Id.* at 14. At the request of prosecutors, Hughes met with Jaw.L. in person on April 16, 2021. During a three-way telephone conversation between Hughes, Jaw.L., and prosecutors, Jaw.L. asserted that he would testify at trial. Hughes and the prosecutors assured Jaw.L. that they would not tell anyone about the meeting. According to Hughes, during the meeting, Jaw.L. was "very relaxed * * * willing to cooperate * * * [and] 100 percent in agreement with [testifying]." *Id.* at 15.

{¶ 67} Thereafter, on April 19, 2021, the day trial commenced, Hughes received a text message from Jaw.L. stating, "[t]hings are real bad." *Id.* Hughes immediately called Jaw.L., who reported that he had received "death threats" via text messages and a telephone call from an unknown private number. *Id.* at 15-16. Jaw.L. told Hughes that the caller warned that "if he testified, he would be dead by Friday." *Id.* at 16. According to Hughes, Jaw.L. was "very upset, very nervous," and told Hughes he was not going to testify. *Id.* at 15. Perceiving the threats to be genuine, Hughes immediately contacted prosecutors and reported what Jaw.L. had told her.

{¶ 68} Soon thereafter, Hughes contacted Jaw.L. to check on his well-being. He told Hughes he had received a letter via text message and that "they knew everything," including that he had met with prosecutors and Hughes. *Id.* at 17. He further averred that the letter contained information only appellant would know. Jaw.L. further reported that he was being followed and that "they" knew where he lived and what he had for dinner the previous evening. *Id.* According to Hughes, Jaw.L. was "extremely worried" and told Hughes he did not want to testify. *Id.* at 17-18. Thereafter, prosecutors and Hughes made "significant efforts" to persuade Jaw.L. to testify. *Id.* at 18. Hughes opined that but for the letter and the telephone call, Jaw.L. would have testified.

{¶ 69} On cross-examination, Hughes averred that Jaw.L. was served with a subpoena at the March 4, 2021 meeting. She acknowledged that Jaw.L. did not tell her on what social media platform the anonymous threats were posted, that he had never sent her screenshots of the text messages or forwarded them to her, and that she had never viewed Jaw.L.'s phone. She further acknowledged that she did not know whether Jaw.L. had told anyone else about his meeting with her and the prosecutors.

{¶ 70} Detective Robert C. Vass testified that he was assigned to the CIU for approximately eight and one-half years prior to his current assignment as a SWAT officer. Vass provided general testimony about both CIU and SWAT involvement in assessing the validity and credibility of threats made to cooperating witnesses and placement of those witnesses in protective custody if necessary. Vass also testified generally that incarcerated gang members are often able to communicate with unincarcerated gang members.

{¶ 71} Specific to this case, Vass testified that he became familiar with the Deuce Deuce Bloods when he worked in CIU and in that capacity had testified as an expert

regarding their criminal gang activity. He remains in contact with gang members in his capacity as a SWAT officer executing both search warrants and arrest warrants. Vass described the Deuce Deuce Bloods as a "violent gang." *Id.* at 26. On April 19, 2021, Vass was asked to conduct a threat assessment regarding an individual who was scheduled to testify in a homicide case involving the Deuce Deuce Bloods. Vass interviewed the individual, later identified as Jaw.L., at an undisclosed location on the afternoon of April 19, 2021. During that interview, Jaw.L. stated that he had received an anonymous telephone call that morning; the caller warned him not to testify, stating specifically that he "wouldn't make it until the end of the week" if he did so. *Id.* at 33. Jaw.L. also showed Vass a screenshot of a handwritten letter he had received via text message on his phone. (State's Ex. Z-1.) Vass averred that he later met with the prosecutor and Jaw.L. at an undisclosed location to discuss the contents of the letter. Because the letter was difficult to read on Jaw.L.'s phone, Vass had the letter transcribed. (State's Ex. Z-2.) Vass read the transcribed version of the letter into the record. It states in its entirety:

> Babe, I just started my hole time. * * * I miss you so much. I'm in here going through it. I don't know what's about to happen. My lawyers just came down here and they said some BS. I'm really about to go on the 19th though, but they said that [Jaw.L.] met with the prosecutor and his PO and said he is coming. At least that's what the prosecutor told my lawyer. He told them that it's a lot of pressure about him coming to court.
>
> He said like three different names in an interview and never once said mine until they got him alone, and they covered up that statement. They said they will let me see it next week. They still said don't worry about Black [Vinson] though.
>
> Baby, I need you to hop on some 'you want your [N word] home' type shit. I know you do, but I need you to get super aggressive with all my brothers, and like as soon as you get this letter, AND DON'T LET UP!![10] They not going to get mad at you. And if they do * * *.
>
> You want your [N word] here, period. Call Dog, Wop, and Nut Box and then tell them you got to do something about this

---

[10] In State's Ex. Z-1 and Z-2, the phrase "and don't let up" appears in uppercase letters, followed by two exclamation points. The same phrase appears in the hearing transcript in lowercase letters without the exclamation points.

little [N word].  And don't call like I'm telling you to call; call like you want your [N word] home.  Use your own words and blow down on them [N word].  Let them know you mad they ain't doing nothing.  They ain't got no choice but to respect it.

Tell Dog and Wop who Nut Box is * * * and tell them he can get to the [N word] easy, and tell them it can't be no violence.  Tell them a bad pill or a nap * * * until it's over, and then let him go.  Tell them Nut Box can put it together.

Please don't let this slip your mind, momma.  This is my last chance.  Call Nut Box and tell him what the [N word] said to the prosecutor, but tell him don't say nothing to the [N word], just keep him close.

If you get that money you was supposed to get, tell Nut you like got three racks to make sure dude pop a pill or something.  And if he with it, let Dog know to tell them to put something together, or you can get one of them girls you be with to pull up on Nut to make sure.

*Id.* at 36-38; State's Ex. Z-2.

{¶ 72}  Vass interpreted several of the phrases contained in the letter.  For example, Vass stated that the phrase "hole time" meant "a location inside the jail," and that "nap" meant "kidnap."  *Id.* at 36, 37.  Vass construed the phrase "super aggressive with all my brothers" to mean "don't wait.  Get the crew [meaning other gang members] together and * * * go find this kid."  *Id.* at 39-40.  Vass translated the phrases "don't let up" and "be aggressive" to mean "you've * * * got to do it now.  I'm running out of time.  It's got to be done right away."  *Id.* at 40.  According to Vass, the reference to getting "one of them girls * * * to pull up" meant that "females * * * can get closer to the guys, make them relax, get them to drop their guard and get them intoxicated; and then the gang members will come in and commit the crime."  *Id.* at 44.  The reference to "a bad pill or a nap until it's over" meant that someone would give the target a drug like ecstasy to make the target incoherent so that the target could be moved from one location to another until the legal proceedings were completed.  *Id.* at 43.  Vass translated the reference to "three racks" as meaning that $3,000 would be paid to complete the kidnapping; according to Vass,  1 "rack" equals $1,000.  *Id.*

{¶ 73} Vass averred that Jaw.L. took the threats very seriously and was "terrified" that he was going to be killed by the end of the week if he testified. *Id.* at 44. According to Vass, Jaw.L.'s main concern was that since he could not identify the person or persons responsible for the threats, he was afraid the person or persons would be able to get close to him without him knowing he was in danger.

{¶ 74} Vass stated that he and other officers spent over two hours on April 19, 2021 urging Jaw.L. to testify, but he continually refused to do so. Indeed, according to Vass, "[Jaw.L.] got to the point where he was like, "[j]ust throw me in jail if you have to, but I'm not testifying." *Id.* at 45. When Vass left that evening, Jaw.L. remained uncooperative and refused to testify.

{¶ 75} The next day, April 20, 2021, Vass and other officers again contacted Jaw.L. and urged him to testify. Vass explained all available options for ensuring Jaw.L.'s safety, including placing him in protective custody, moving him to another location, and providing him financial assistance. Jaw.L. steadfastly refused to testify, stating he just needed to "move on" and "get away from all of this." *Id.* at 46. The next day, April 21, 2021, Vass sent Jaw.L. a text message at approximately 6:00 a.m.; Jaw.L. responded that he was planning to leave protective custody. Shortly thereafter, Vass learned that Jaw.L. had left protective custody and refused further assistance from CDP.

{¶ 76} On cross-examination, Vass averred that he had not taken screenshots of Jaw.L.'s phone and did not have Jaw.L. show him the alleged social media threats on his phone. According to Vass, the only thing he saw on Jaw.L.'s phone was the hand-written letter.

{¶ 77} The parties stipulated to State's Ex. Z-3, an April 2, 2021 entry from the Franklin County jail establishing that appellant was in "lockdown" at the jail from March 30 to April 9, 2021.

{¶ 78} Following presentation of the evidence and arguments by counsel, the trial court issued an oral decision granting the prosecutor's Evid.R. 804(B)(6) motion. The trial court began its analysis by stating that it had compared the handwriting in a pro se motion to dismiss appellant previously filed in the case to the handwriting in the letter Jaw.L. received via text message. The court concluded that the handwriting "appears to be the same." (Mot. Hearing Tr. at 74.) The court averred that the motion to dismiss was a matter

of court record and that "it's one of those things that as a trier of fact I can make the comparison, even though it wasn't proffered by you all." *Id.*

**{¶ 79}** The court then permitted argument on the matter. To that end, defense counsel asserted that the motion to dismiss could not be considered because it was extrinsic evidence. The court responded, "[i]t's part of the Court record, so it's not extrinsic." *Id.* Next, defense counsel argued that the motion had not been marked as an exhibit for purposes of appeal. The court countered that the motion had been marked as "Court Exhibit Alpha." *Id.* Defense counsel then contended that any handwriting analysis required expert testimony. The trial court asserted that case law established that "the trier of fact can make that comparison on handwriting," and that "experts only testify what to look for, and unfortunately I've probably heard about 50 of these." *Id.* The court further stated that appellant "has very distinctive D's * * * [and] E's and lower casings * * * and they seem to compare." *Id.*

**{¶ 80}** The trial court averred that it made the comparison to benefit and protect appellant:

> I [made the comparison] more in an interest of protecting [appellant]. Because as it stood right now, indications factually were that that letter was from him. How he got it is secondary. Okay?
>
> He got it in a text. So I was just verifying, trying to protect your client to try to find an out for him, and unfortunately it looked like it's the same handwriting.
>
> And since it was a motion, I think I can consider that evidence, because it's not part of the factual trial.
>
> In all candor, I was doing it for the benefit of [appellant] just to make sure. Because factually, there were things related in that letter that only he would know. And * * * I also had the concerns of him discussing your conversations.

*Id.* at 76.

**{¶ 81}** The court assured defense counsel that "none of this is being considered for the trial aspect of it. * * * This has nothing to do with the credibility of what that witness was." *Id.*

**{¶ 82}** The court then reiterated its justification for conducting the handwriting comparison:

> [I]t is part of the public record. It was on [appellant's] own volition that he submitted the sample. Okay?
>
> And, yeah, it wasn't presented by the State, but, you know, this is a hearing and the State has their burden met. Okay? I was just seeing an independent veracity of the letter. That's what I was after. So it was actually for the benefit of your client. Unfortunately, it didn't work out that way.

*Id*. at 77.

**{¶ 83}** Following this discussion, the court granted the prosecution's motion and permitted the admission of Jaw.L.'s videotaped police interviews (State's Exs. Y-1 and Y-2) and the audiotaped photo array procedure. (State's Ex. Y-3.)

**{¶ 84}** Appellant's hearsay-based argument is two-fold. First, appellant contends that it was receipt of the threatening telephone calls and text messages from unknown individuals, and not receipt of the letter, that prompted Jaw.L.'s decision not to testify. Appellant notes Hughes's testimony that Jaw.L. told her he could not identify the threatening caller and the admissions by both Hughes and Vass that they did not preserve screenshots of the text messages. Appellant maintains that because the threatening calls and text messages could not be traced to appellant, the prosecution failed to establish that he engaged in wrongdoing that resulted in Jaw.L.'s unavailability to testify at trial. Appellant further contends that even assuming he authored the letter, he instructed the recipient to tell the putative kidnappers (Dog, Wop, and Nut Box) not to use violence; thus, any violence by the putative kidnappers was not authorized and thus could not be imputed to him. We reject appellant's argument on both points.

**{¶ 85}** It is clear from the trial court's statements that it granted the Evid.R. 804(B)(6) motion based upon the letter and not the threatening phone calls or text messages. Indeed, the trial court averred that it had examined the letter and compared the handwriting therein to appellant's hand-written pro se motion to dismiss filed earlier in the proceedings. The trial court went to great lengths to explain its reasoning for making the handwriting comparison. The trial court did not mention the threatening phone calls or text messages in its analysis.

{¶ 86} Further, we find no merit to appellant's argument that the letter did not prove that he engaged in wrongdoing that resulted in Jaw.L.'s unavailability because the letter did not authorize violence against Jaw.L. Although the letter references "no violence," the letter urges the recipient to engage Dog, Wop, and Nut Box in a plot to kidnap Jaw.L. and hold him until the trial concluded. As pointed out by the state in its briefing, kidnapping is an offense of violence. R.C. 2905.01(A); 2901.01(A)(9)(a). Further, Evid.R. 804(B)(6) "covers a variety of wrongdoing beyond the murder or physical assault of the declarant." *State v. Harper,* 6th Dist. No. L-15-1310, 2017-Ohio-1395, ¶ 31. *See also State v. Miller,* 9th Dist. No. 14CA010556, 2016-Ohio-4993, ¶ 15 ("a review of the staff notes to Evid.R. 804(B)(6) as well as Ohio case law reveals that the rule is intended to cover more situations than simply those that implicate the murder or serious assault of the declarant. The 2001 Staff Note to Evid.R. 804(B)(6) states that 'the wrongdoing need not consist of a criminal act.' "). In light of this authority, we reject appellant's argument that evidence of a kidnapping plot, even one without "violence," is insufficient to support the trial court's finding that he engaged in wrongdoing for the purpose of making a witness unavailable for trial.

{¶ 87} Appellant also argues that the prosecution failed to establish Jaw.L.'s unavailability to testify. "Unavailability" is defined, as pertinent here, as including situations in which the declarant "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." Evid.R. 804(A)(5).

{¶ 88} The burden is on the proponent of the evidence to establish unavailability, and, in the criminal setting, a witness is only considered unavailable if the prosecution has made reasonable, good-faith efforts to secure his or her presence at trial. *State v. Keairns,* 9 Ohio St.3d 228, 230 (1984), citing *Ohio v. Roberts,* 448 U.S. 56 (1980). The measures the prosecution must undertake in order to fulfill its burden of reasonableness and good faith depend on the facts and circumstances of each case. *State v. Tabor,* 12th Dist. No. CA2011-07-076, 2012-Ohio-4642, ¶ 14.

{¶ 89} Appellant acknowledges Hughes's testimony that the prosecution served Jaw.L. with a subpoena to compel his testimony. However, citing *Keairns,* appellant argues that "the issuance of a subpoena alone does not constitute a sufficient effort when other reasonable methods are also available." (Appellant's Am. Brief at 21.)

{¶ 90} We first note that appellant's reliance on *Keairns* for its subpoena-only argument is unavailing. There, the prosecution offered no sworn testimony of its efforts to locate the witness. The sole support offered consisted of representations of the prosecutor that subpoenas had been issued and that he had asked the sheriff to make a continued search for the witness. The court stated that "[a] showing of unavailability under Evid.R. 804 must be based on testimony of witnesses rather than hearsay not under oath unless unavailability is conceded by the party against whom the statement is being offered." *Keairns* at 232. The court found that the prosecutor's representations had not met that requirement. The court further found that the prosecutor's "continued search" statement lacked sufficient particularity to allow the court to determine what steps had been taken and whether they were reasonable. *Id.* The court ultimately found that "the issuance of a subpoena alone does not constitute a sufficient effort when other reasonable means are also available." *Id.*

{¶ 91} Here, in contrast to *Keairns,* the prosecution presented sworn testimony about its efforts to secure Jaw.L.'s trial testimony both via subpoena and via methods beyond issuance of the subpoena. As noted above, Hughes testified that at the April 19, 2021 meeting "significant efforts" were made to encourage Jaw.L. to testify. Vass testified that on April 19, 2021, he and other police officers pressed Jaw.L. for over two hours to testify, but he repeatedly refused to do so. According to Vass, Jaw.L. ultimately told the officers that they could "throw him in jail," but he still would not testify. The next day, April 20, 2021, Vass again attempted to secure Jaw.L.'s testimony. Vass explained all available options for ensuring Jaw.L.'s safety, including placing him in protective custody, relocating him, and providing him financial assistance, but Jaw.L. adamantly refused to testify. The next morning, April 21, 2021, Vass contacted appellant and again urged him to testify. As did the defendant in *State v. Parker*, 6th Dist. No. L-18-1238, 2020-Ohio-4607, ¶ 94, Jaw.L. made it clear that he "did not want to be involved with the case, did not intend to cooperate with the prosecution of the case, and would not come to court." *Id.* The only additional effort suggested by defense counsel at the hearing was to issue an arrest warrant, bring Jaw.L. into court, and hold him in contempt if he refused to testify. However, as we have already noted, such effort would have proven futile, as Jaw.L. told Vass he would not testify even if he were taken to jail.

{¶ 92} As noted above, the test for unavailability is whether the state made reasonable, good-faith efforts to secure the witness's appearance. The test is not whether the state took every conceivable step possible. "[W]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence * * * but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Hardy v. Cross*, 565 U.S. 65, 71-72 (2011).

{¶ 93} After hearing the evidence, the trial court concluded that the prosecution proved both prongs of the Evid.R. 804(B)(6) test. We discern no basis in the record to conclude that the trial court erred in determining that the prosecution demonstrated by a preponderance of the evidence that appellant engaged in wrongdoing for the purpose of preventing Jaw.L. from testifying at trial and that it made reasonable, good-faith efforts to secure Jaw.L.'s presence at trial. As a result, we conclude that the trial court properly admitted Jaw.L.'s out-of-court statements to the police under Evid.R. 804(B)(6).

{¶ 94} Turning to appellant's constitutional argument, we note that the Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to confront the witnesses against him. This protection " 'requires, wherever possible, testimony and cross-examination to occur at trial.' " *Harper*, 6th Dist. No. L-15-1310, 2017-Ohio-1395, at ¶ 33, quoting *State v. Myers*, 9th Dist. No. 25737, 2012-Ohio-1820, ¶ 21. However, the right to confront one's accuser "is not absolute and 'does not necessarily prohibit the admission of hearsay statements against a criminal defendant.' " *State v. Madrigal*, 87 Ohio St.3d 378, 385 (2000), quoting *Idaho v. Wright*, 497 U.S. 805, 813 (1990). Indeed, courts have "explicitly preserved the principle that an accused has forfeited his confrontation right when the accused's own misconduct is responsible for a witness's unavailability." *Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, at ¶ 105, citing *Crawford v. Washington,* 541 U.S. 36, 62 (2004) ("The rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be alternative means of determining reliability."). The *Hand* court also cited *Reynolds v. United States,* 98 U.S. 145, 158 (1879) (stating that if the witness is unavailable due to the defendant's own misconduct, the defendant "is in no condition to assert that his constitutional rights have been violated").

{¶ 95} Here, the trial court determined that Jaw.L.'s out-of-court statements to the police were admissible upon a finding that appellant, through the letter, threatened to kidnap Jaw.L. for the purpose of making him unavailable to testify at trial. As discussed above, we have determined that the trial court did not err in making that finding. As a result, we conclude that appellant forfeited his confrontation right by engaging in this wrongdoing and that the trial court did not err by admitting Jaw.L.'s out-of-court statements into evidence.

{¶ 96} As to appellant's argument that the trial court erred in overruling his motion to suppress and admitting Jaw.L.'s photo array identification into evidence, we note initially that appellant filed his written motion to suppress on April 19, 2021, the first day of trial. The prosecution did not file a written response and there was no formal hearing on the motion. At the close of the third day of trial, after the prosecution had already presented its evidence pertaining to the photo array identification (State's Ex. Y-3), the prosecution reminded the trial court of the pending motion, and the trial court overruled it.

{¶ 97} Appellant contends that Jaw.L.'s pre-trial identification derived from an unnecessarily suggestive photo array procedure. Courts have adopted a two-prong test to determine the admissibility of pre-trial identification testimony. *Glenn-Coulverson*, 10th Dist. No. 16AP-265, 2017-Ohio 2671, at ¶ 52. First, there must be a determination that the identification procedure was so impermissibly suggestive as to give right to a substantial likelihood of misidentification. *Id.*, citing *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, ¶ 38 (10th Dist.), citing *Neil v. Biggers*, 409 U.S. 188 (1972). Second, there must be a determination that the identification itself was unreliable under the totality of the circumstances. *Id.*, citing *Monford* at ¶ 38. If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Id.*, citing *State v. Reddy*, 10th Dist. No. 09AP-868, 2010-Ohio-3892, ¶ 31. A pretrial identification may be suppressed only if it is both unnecessarily suggestive and unreliable under the totality of the circumstances. *Monford* at ¶ 40.

{¶ 98} Appellant fails to show that the photo array procedure was unduly suggestive. CDP used a blind administrator in compliance with R.C. 2933.83. Such measure generally ensures compliance with due process. *State v. Howard*, 8th Dist. No. 100094, 2014-Ohio-

2176, ¶ 33.  The administrator advised Jaw.L. that he was not required to select any photograph and that the subject of the investigation may or may not be included in the photographs.  (State's Ex. Y-3.)

{¶ 99} Noting Jaw.L.'s initial statement that "photographs 1, 2, 4, and 6 looked familiar," appellant points to the administrator's statements that "you're referencing number 6 there, can you say that is, is not, or you aren't sure" and "I don't want to put words in your mouth but, are you able to answer with any of those three?" as "improperly steer[ing] [Jaw.L.] into selecting [appellant's] photograph."  (Appellant's Am. Brief at 26.) We disagree.  The administrator did not know that the person depicted in photograph number 6 was the suspect.  Further, the question by its own terms does not impermissibly suggest that photograph number 6 was the suspect.  Indeed, two of the three options offered by the administrator, i.e., "is not" or "not sure" would have led to a non-identification of number 6.

{¶ 100}     Even assuming the administrator's question was impermissibly suggestive, suppression of the identification would still be improper because Jaw.L.'s identification was reliable.  We have already addressed and rejected appellant's identical arguments regarding the reliability of the identification in our disposition of the first assignment of error.

{¶ 101}     The second assignment of error is overruled.

{¶ 102}     Appellant's third assignment of error alleges two instances of judicial bias: (1) the trial court's participation in the pre-trial *in camera* certification hearing conducted under Crim.R 16(F), and (2) the trial court's independent examination of the pro se motion to dismiss at the Evid.R. 804(B)(6) hearing. Appellant maintains that these acts constitute reversible structural error.  We disagree.

{¶ 103}     "A structural error is a violation of the basic constitutional guarantees that define the framework of a criminal trial." *State v. West*, ___Ohio St.3d ___, 2022-Ohio-1556, ¶ 2.  "Structural error has been recognized only in limited circumstances involving fundamental constitutional rights, including the denial of counsel to an indigent defendant, the denial of counsel of choice, the denial of self-representation at trial, the denial of a public trial, and the failure to instruct the jury that the accused's guilt must be proved beyond a reasonable doubt." *Id.* at ¶ 26, citing *Weaver v. Massachusetts*, ___U.S.___, 137

S.Ct. 1899, 1908 (2017). In addition, the " '[t]he presence of a biased judge on the bench is, of course, a paradigmatic example of structural constitutional error.' " *State v. Pippins,* 10th Dist. No. 15AP-137, 2020-Ohio-503, ¶ 69, quoting *State v. Sanders*, 92 Ohio St.3d 245, 278 (2001), citing *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).

{¶ 104} "The term ' "bias" ' implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *State v. Skerkavich*, 8th Dist. No. 105455, 2019-Ohio-4973, ¶ 24, quoting *In re Disqualification of O'Neill,* 100 Ohio St.3d 1232, 2002-Ohio-7479, ¶ 14, quoting *State ex rel. Pratt v. Weygandt,* 164 Ohio St. 463, 469 (1956). " '[T]he threshold inquiry is whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the [trial] court's conduct falls demonstrably outside this range so as to constitute hostility or bias.' " *Id.,* quoting *State v. Cepec,* 149 Ohio St.3d 438, 2016-Ohio-8076, ¶ 74, citing *McMillen v. Castro,* 405 F.3d 405, 410 (6th Cir.2005). "It is the burden of the accused * * * to demonstrate that the judge became biased or that the judge participated so continuously in the investigation and was exposed to such prejudicial information that bias would be perceived by an objective observer reviewing the case." *Pippins* at ¶ 71.

{¶ 105} Structural error "is not susceptible to harmless-error review but rather, when an objection has been raised in the trial court, is grounds for automatic reversal." *West* at ¶ 2, citing *State v. Jones,* 160 Ohio St.3d 314, 2020-Ohio-3051, ¶ 2, 20. "But when the accused fails to object to the error in the trial court, appellate courts apply the plain-error standard of review, shifting the burden to the accused to demonstrate that the error affected the trial's outcome." *Id.,* citing *Jones* at ¶ 17.

{¶ 106} We first consider appellant's Crim.R. 16(F) argument. Crim.R. 16 addresses discovery and inspection of the prosecution's evidence by a defendant. Crim.R. 16(D)(1) specifically states: "If the prosecuting attorney does not disclose materials or portions of materials under this rule, the prosecuting attorney shall certify to the court that the prosecuting attorney is not disclosing material or portions of material otherwise subject to disclosure under this rule for one or more of the following reasons: (1) The prosecuting attorney has reasonable, articulable grounds to believe that disclosure will compromise the

safety of a witness, victim, or third party, or subject them to intimidation or coercion" [or] * * * (5) "[t]he interests of justice require non-disclosure."  Crim.R. 16(D)(1), (D)(5).

{¶ 107}     Upon a defendant's motion, the trial court must hold an *in camera* hearing seven days prior to trial.  Crim.R. 16(F).  If the trial court finds an abuse of prosecutorial discretion, then the prosecutor must immediately disclose the material. *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, at ¶ 52, citing 2010 Staff Note, Crim.R. 16(F).  Otherwise, the material must be disclosed "no later than commencement of trial." *Id.,* citing Crim.R. 16(F)(5).

{¶ 108}     In the present case, the prosecution certified non-disclosure of materials relating to Jaw.L.'s statements to the police and photo array identification.  As reasons for the non-disclosure, the prosecution asserted that it had reasonable, articulable grounds to believe that disclosure would compromise Jaw.L.'s safety and that the interests of justice required non-disclosure.

{¶ 109}     In accordance with Crim.R. 16(F), the trial court held an *in camera* certification hearing seven days prior to trial.  No witnesses were called at the hearing. Although appellant was not present, defense counsel appeared on his behalf.  The prosecution discussed appellant's and Vinson's membership in the Deuce Deuce Bloods, and described the gang as "one of the most dangerous gangs here in Franklin County." (Apr. 12, 2021 Hearing Tr. at 3.)  The prosecution further stated that the Deuce Deuce Bloods had been involved in multiple homicides, that Vinson had been personally responsible for more than ten homicides, and that appellant had access to other gang members while in jail.  In addition, the prosecution stated that the three surviving occupants of the Honda CR-V, including Jaw.L., had been threatened and were afraid to testify.  The prosecution averred that, with the redaction of Jaw.L.'s name, it had provided the defense a summary of Jaw.L.'s first interview with the police and a summary of his selection of appellant from a photo array; however, the prosecution had not provided the defense with either a summary of Jaw.L.'s second police interview or the audio-recording of the photo array procedure.  The prosecution acknowledged that defense counsel had already determined Jaw.L.'s identity; however, it sought certification to protect Jaw.L.'s identity from appellant until the start of trial.

{¶ 110}        At the conclusion of the hearing, the trial court found that the prosecution had demonstrated reasonable, articulable grounds to believe that disclosure would compromise Jaw.L.'s safety or subject him to intimidation or coercion. On April 16, 2021, the court issued a sealed entry memorializing its oral decision.

{¶ 111}        In *State v. Gillard*, 40 Ohio St.3d 226 (1988), the Supreme Court of Ohio held that "when the state seeks to obtain relief from discovery or to perpetuate testimony under Crim.R. 16(B)(1)(e) [now addressed under Crim.R. 16(D)(1)], the judge who disposes of such a motion may not be the same judge who will conduct the trial." *Id.* at paragraph one of the syllabus. *Gillard* adopted this rule because "when a judge hears information that a defendant has attempted to harm, coerce, or intimidate an opposing witness, there is an unnecessary risk that the judge will harbor a bias against that defendant." *Id.* at 229. Appellant contends that his case falls within the syllabus rule of *Gillard* and, as such, the trial judge who presided over the certification hearing had a duty to sua sponte recuse himself from presiding over the trial and his failure to do so constitutes reversible structural error.

{¶ 112}        Initially, we note that the Supreme Court of Ohio has determined that a violation of the *Gillard* rule is not structural, as the holding in that case was not based on any constitutional provision. *State v. Esparza*, 74 Ohio St.3d 660, 661-62 (1996). Moreover, even if the error could be classified as structural constitutional error, we find no indication that the trial judge in this matter exhibited bias against appellant in presiding over both the certification hearing and the bench trial. Accordingly, structural analysis is not invoked. *Pippins*, 10th Dist. No. 15AP-137, 2020-Ohio-503, at ¶ 75. Even if structural analysis were invoked, appellant neither raised the issue that the certification matter should be heard by another judge nor objected to the judge presiding over the bench trial. As such, appellant has forfeited all but plain error. *West*, ___Ohio St.3d___, 2022-Ohio-1556, at ¶ 28. (Assertions of structural error do not preclude an appellate court from applying the plain-error standard when the accused has failed to object.) *See also State v. McAlpin*, ___Ohio St.3d___, 2022-Ohio-1567, ¶ 66. ("[T]he plain-error rule still applies to errors that were never objected to at trial, even if those errors can be classified as structural.").

{¶ 113}        Under the plain error standard of review, the accused bears the burden of " 'showing that but for a plain or obvious error, the outcome of the proceeding

would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.' " *West* at ¶ 22, quoting *State v. Quarterman,* 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 16. "An appellate court has discretion to notice plain error and therefore 'is not required to correct it.' " *Id.*, quoting *State v. Rogers,* 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 23.

{¶ 114}     Appellant argues that but for obvious error in the trial court presiding over both the Crim.R 16(F) hearing and the bench trial, the outcome of the trial would have been different. Appellant maintains this is so because the evidence against him was "far from overwhelming." (Appellant's Am. Brief at 38.) Appellant argues that the uncertainties surrounding Jaw.L.'s pretrial identification of appellant resulted in only "extremely weak proof on the element of identity," and that the "insertion of a biased fact-finder into the trial created a probability of prejudice sufficient to undermine confidence in the guilty verdicts of the trial judge." (Appellant's Am. Brief at 38.)

{¶ 115}     In our resolution of appellant's first assignment of error, we considered and rejected appellant's arguments regarding Jaw.L.'s pretrial identification of appellant as the shooter. Further, appellant's argument fails to acknowledge the presence of his DNA on the hat found at the scene. In addition, appellant's argument assumes bias on the part of the trial judge in presiding over both the certification hearing and the bench trial. As noted above, we discern no evidence of judicial bias in that regard.

{¶ 116}     We likewise find no evidence of judicial bias in the trial court's independent examination of the pro se motion to dismiss at the Evid.R. 804(B)(6) hearing. As noted above, after announcing its conclusion that the handwriting in the motion to dismiss appeared to match that in the letter Jaw.L. received via text message, the trial court invited argument. Appellant argued that the motion constituted "extrinsic evidence," that it was "not marked * * * for appeal purposes," and that it constituted "expert testimony." (Apr. 21, 2021 Tr. at 75.) However, appellant did not object on the grounds he now raises on appeal, i.e., that the trial court's handwriting comparison demonstrated judicial bias. " 'Objection on one ground does not preserve another, unmentioned grounds.' " *State v. Hairston*, 10th Dist. No. 15AP-1013, 2016-Ohio-8495, ¶ 34, quoting *State v. Wallace*, 10th Dist. No. 08AP-2, 2008-Ohio-5260, ¶ 25. As noted above, failure to object results in

forfeiture, even when the error would otherwise be structural. *McAlpin* at ¶ 66. Thus, appellant's judicial-bias argument is subject to plain error review.

{¶ 117}     Even if appellant had preserved the judicial-bias argument, appellant cannot demonstrate any error, much less plain error. The trial court's decision to compare the letter with the motion does not evince any "hostile feeling or spirit of ill will" against appellant. *Skerkavich*, 8th Dist. No. 105455, 2019-Ohio-4973, at ¶ 24. Just the opposite, the trial court indicated its intention was to benefit appellant by making the comparison. Indeed, the trial court explained that the letter, "on its face without the comparison" indicated that appellant was the author. (Apr. 21, 2021 Hearing Tr. at 76.) The trial court averred that it compared the handwriting in the documents "in an interest of protecting [appellant]" and to find "an out" for appellant. *Id.*

{¶ 118}     Further, under the circumstances presented here, we cannot conclude that the trial court's investigation was improper. The trial court did not venture outside its own docket in making the comparison. "[A] trial court is not required to suffer from institutional amnesia. It is axiomatic that a trial court may take judicial notice of its own docket." *Indus. Risk Insurers v. Lorenz Equip. Co.*, 69 Ohio St.3d 576, 580 (1994). Appellant filed the motion expecting the trial court to review it.

{¶ 119}     Appellant's citation to *J.S. v. L.S.*, 10th Dist. No. 19AP-400, 2020-Ohio-1135 is unavailing. There, one of the parties in a CPO hearing submitted documents from cases in other counties. *Id.* at ¶ 9. After the trial court's staff attorney researched the cases online, the trial court concluded that the submitted documents were "fraudulent." *Id.* at ¶ 11. This court reversed, finding that the trial court gave the party no time to respond to the court's accusation of wrongdoing. *Id.* at ¶ 23.

{¶ 120}     Here, the trial court considered a document previously filed by appellant in this case. The court gave both parties the opportunity to make a record in response to its finding that the handwriting in the letter matched the handwriting in the motion to dismiss. The court recessed for two hours to give defense counsel the opportunity to "see what they come up with." *Id.* at ¶ 79. However, the defense called no additional witnesses and offered no further arguments.

{¶ 121}     In short, even if appellant had properly preserved the argument he now raises, he has failed to demonstrate bias; thus, there is no structural error and no

automatic reversal. Appellant fails to show that it was plain error for the trial court to conduct the handwriting comparison. Moreover, appellant fails to demonstrate any reasonable probability of prejudice. The handwriting comparison essentially had no effect on the outcome of the Evid.R. 804(B)(6) hearing because it merely confirmed what the trial court had already concluded based on the contents of the letter, i.e., that appellant wrote the letter. Appellant provides no proof that at any point in the trial that the trial court exhibited hostility or ill will toward appellant that affected the guilty verdicts.

{¶ 122}        The third assignment of error is overruled.

{¶ 123}        In his fourth assignment of error, appellant argues that the trial court's failure to disclose its participation in the certification hearing and its concomitant exposure to the information at that hearing regarding appellant's gang involvement prior to appellant's reaffirmance of his decision to waive jury invalidated his original jury waiver. Thus, argues appellant, his jury waiver was not made voluntarily, knowingly, and intelligently in violation of his constitutional right to trial by jury. Appellant maintains that the trial court's error amounts to reversible structural error. We disagree.

{¶ 124}        On February 17, 2021, the trial court held a hearing on appellant's expressed desire to waive his right to trial by jury. At that hearing, the court explained the waiver process and advised appellant of the consequences of proceeding to trial before the court rather than a jury. Appellant indicated he understood the court's explanation and admonitions and then executed the written waiver in open court. Thereafter, the court informed counsel that the Crim.R. 16(F) certification hearing would be set for April 12, 2021. Addressing appellant, the court described the certification hearing as "a technicality we've got to deal with that day." (Feb. 17, 2021 Tr. at 28.) Appellant's written jury waiver was filed the same day.

{¶ 125}        On the first day of trial, the prosecutor stated, "I know we already did a lengthy colloquy regarding his right to waive jury, and we've already gone on the record. I guess I would just ask again this morning that it's still his intention to waive jury and go forward with a bench trial." The trial court asked appellant, "Is that still your intention? Appellant responded, "Yes, sir." (Apr. 19, 2021 Tr. at 56.) No mention of the certification hearing and/or the information provided at that hearing was made by defense counsel, the

prosecutor, or the trial court, nor did defense counsel object to the adequacy of the trial court's colloquy with appellant during the reaffirmation process.

{¶ 126}     Appellant does not dispute that the original jury waiver was both constitutionally and statutorily valid. Rather, appellant argues that the trial court's failure to advise him of the effect of the Crim.R. 16(F) hearing essentially invalidated the original waiver, and, as such, he was never apprised of, and thus was deprived of, his constitutional right to trial by jury. The deprivation of a right to trial by jury has "consequences that are necessarily unquantifiable and indeterminate [and] unquestionably qualifies as a 'structural error.' " *Sullivan v. Louisiana,* 508 U.S. 275, 281-82. However, assuming, without deciding, that an error in obtaining a jury waiver deprives an accused of the right to trial by jury, thus qualifying as structural error, appellant never requested that the trial court engage in any additional colloquy when he reaffirmed his jury waiver. As a result, appellant has forfeited all but plain error. *McAlpin*, ___Ohio St.3d___, 2022-Ohio-1567, at ¶ 66.

{¶ 127}     Appellant has failed to demonstrate plain error. Appellant does not point us to any authority specifically holding that the trial court was required to advise appellant of its participation in the certification hearing prior to engaging in the additional colloquy about appellant's jury trial waiver. Furthermore, appellant fails to show prejudice. At the February 17, 2021 hearing, appellant was adamant in his decision to waive jury, even over defense counsel's advice to the contrary. There is no reasonable probability that an additional colloquy regarding the certification hearing would have caused appellant to withdraw his jury waiver or otherwise change the outcome of the trial.

{¶ 128}     The fourth assignment of error is overruled.

{¶ 129}     In his fifth assignment of error, appellant contends that the trial court erred in admitting certain evidence at trial. Initially, we note that " ' "a judge [in a bench trial] is presumed to consider only the relevant, material and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record." ' " *State v. Long*, 10th Dist. No. 20AP-90, 2021-Ohio-2656, ¶ 26, quoting *State v. Powell,* 10th Dist. No. 14AP-1054, 2015-Ohio-4459, ¶ 20, quoting *State v. Johnson*, 5th Dist. No. 2014CA00189, 2015-Ohio-3113, ¶ 91, citing *State v. White*, 15 Ohio St.2d 146, 151 (1968). "Indeed, Ohio court[s] have held '[i]n contrast to juries, judges are presumed to know the

law and expected to consider only relevant, material, and competent evidence during their deliberations.' " *Id.*, quoting *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, ¶ 57.

{¶ 130}        Appellant first challenges the admission of Smittle's testimony and related photograph regarding appellant's possession of a handgun that was not tied to the shootings. Appellant maintains that the admission of this evidence violated the prohibition against propensity evidence set forth in Evid.R. 404(B) and R.C. 2945.59. "Generally, the admission or exclusion of evidence lies within the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion." *State v. Daylong*, 10th Dist. No. 19AP-279, 2021-Ohio-4192, ¶ 22. However, whether evidence of other acts is admissible under Evid.R. 404(B) is a question of law that we review de novo. *State v. Hartman,* 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22.

{¶ 131}        "Both Evid.R. 404(B) and R.C. 2945.59 'preclude admission of other acts evidence to prove a character trait in order to demonstrate conduct in conformity with that trait,' *State v. Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 16, or 'to show the accused's propensity or inclination to commit crime[.]' *id.* at ¶ 15." *State v. Thomas,* 152 Ohio St.3d 15, 2017-Ohio-8011, ¶ 35. To be admissible, the other-acts evidence must be "probative of a separate, nonpropensity-based issue." *Hartman* at ¶ 22.

{¶ 132}        As noted above, Smittle, the prosecution's gang expert, testified that the CIU maintained a "gang packet" on appellant that demonstrated his involvement with guns, drugs, and drug trafficking. The "gang packet" includes a photograph of appellant in a vehicle holding a large amount of cash and a handgun. When asked by the prosecutor to explain the significance of the photograph "in relation to documented criminal gangs here in Columbus," Smittle responded, "[o]bviously weapon possession." (Tr. at 353.) Smittle agreed with the prosecutor's assessment that the photograph demonstrated appellant's prior commission of a WUD offense. Appellant argues that the testimony and photograph was improper other-acts evidence because there was no evidence linking the handgun depicted in the photograph to either of the firearms used in the shootings.

{¶ 133}        Appellant did not object to Smittle's testimony or the photograph. Thus, we review their admission for plain error. Appellant fails to show plain error because the testimony and photograph were probative of a nonpropensity-based issue, i.e., to prove the gang specifications under R.C. 2941.142(A). *Glenn-Coulverson*, 10th Dist. No. 16AP-

265, 2017-Ohio-2671, at ¶ 36; *Wade*, 10th Dist. No. 16AP-674, 2018-Ohio-876, at ¶ 53. Indeed, the prosecutor asked Smittle about the photograph "in relation to documented criminal gangs here in Columbus." Appellant's possession of the handgun and cash "tended to show that he was an active member of the gang." *Glenn-Coulverson* at ¶ 36. Further, the statutory definition of "criminal gang" requires proof that "[t]he persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity." R.C. 2923.41(A)(3). The "pattern of criminal gang activity" element requires that persons in the criminal gang have committed two or more enumerated offenses. R.C. 2923.41(B)(1). The photograph depicts appellant committing a felony WUD offense and improper handling of a firearm. R.C. 2923.41(B)(1)(a) and (c).

{¶ 134} Appellant also fails to show prejudice. During closing argument, the prosecutor referenced the testimony and photograph only in connection with the gang specifications. (Tr. at 667.) Even after defense counsel suggested in his closing argument that the prosecution's gang evidence was improper other-acts evidence, the prosecutor in rebuttal reiterated that the gang evidence was relevant to prove the gang specifications. (Tr. at 699-700). The prosecutor did not make any propensity-based arguments relating to appellant's possession of the gun in the photograph. Nothing in the record establishes that the trial court considered the testimony and photograph for any improper propensity purpose. Thus, there is no reasonable probability that this evidence contributed to the trial court's verdict beyond the proper use of proving the gang specifications.

{¶ 135} Appellant's reliance on *Thomas,* 152 Ohio St.3d 15, 2017-Ohio-8011, and other cases for the proposition that evidence of a defendant's possession of a weapon unrelated to the offense is inadmissible and prejudicial under Evid.R. 404(B) and R.C. 2945.59 is without merit. None of the cited cases involve the admission of weapons possession evidence to prove a gang specification. Indeed, in *Thomas,* the court found that the prosecutor offered the evidence to portray the defendant "as a person of violent character who had acted in conformity with his propensity to kill—a use of evidence prohibited by Evid.R. 404(B) and R.C. 2945.59." *Id.* at ¶ 49. Here, the prosecution offered the evidence to prove the gang specifications, not to prove that appellant was a violent character who acted in conformity with his propensity to kill.

{¶ 136}      Appellant next alleges that Smittle's testimony that appellant and Vinson were members of the Deuce Deuce Bloods gang and participated in a pattern of criminal conduct was irrelevant and based on inadmissible hearsay.  We disagree.

{¶ 137}      Appellant premises his relevance argument on his assertion that the shootings were not "gang related."  We rejected this argument in concluding that the prosecution proved the gang specifications.  Further, evidence establishing that appellant and Vinson were members of the Deuce Deuce Bloods was relevant to prove the underlying offenses.   Vinson drove the car from which the shots were fired and his DNA was on the gun that killed S.C.  That appellant and Vinson are both members of the same gang corroborates appellant's identity as one of the shooters.

{¶ 138}      Appellant also challenges the relevancy of Smittle's testimony regarding the Deuce Deuce Bloods' history of criminal activity.  That testimony was relevant to prove the "pattern of criminal gang activity" element of the gang specifications by demonstrating that persons in the gang have committed two or more enumerated offenses.  R.C. 2923.41(B)(1).  Absent proof of the specific crimes committed by the Deuce Deuce Bloods, the evidence would have been insufficient to prove the gang specifications.  *State v. Johnson,* 10th Dist. No. 07AP-538, 2008-Ohio-590, ¶ 39-40.  The record contains no indication that the trial court considered the evidence regarding the Deuce Deuce Bloods' history of criminal activity for any purpose other than to prove the gang specifications under R.C. 2941.142 (A).

{¶ 139}      Equally untenable is appellant's claim that Smittle's testimony about appellant's gang membership derived from hearsay sources such as field interviews from other officers, information obtained from confidential informants, and social media posts.  Initially, we note that this testimony was not offered to prove appellant's gang membership specifically; rather, it was offered as general background information about how CDP identifies and investigates gang membership.  Smittle's testimony about appellant's membership in the Deuce Deuce Bloods derived in large part from photographs and self-admissions included in the "gang packet."  The photographs themselves are not "statements" that would implicate the hearsay rules.  Evid.R. 801(A); *State v. Clifford,* 5th Dist. No. 19 CAA 12 0068, 2020-Ohio-5095, ¶ 15.  To the extent that the photographs depict statements by appellant, i.e., flashing gang signs, wearing red clothing, displaying a

"Bloods" tattoo, and maligning the rival Crips gang by using a "K" instead of "C," such statements are non-hearsay party admissions. Evid.R. 801(D)(2) (A statement is not hearsay if it "is offered against a party and is * * * the party's own statement.").

{¶ 140}    Appellant also challenges admission of the testimony offered by Hughes and Vass at the Evid.R. 804(B)(6) hearing. Appellant contends that the prosecution failed to show that Hughes and Vass were unavailable to testify as is required to admit former testimony as a hearsay exception under Evid.R. 804(B)(1). Under Evid.R. 804(B)(1), there are six hearsay exceptions that apply when the hearsay declarant is "unavailable." Applicable here is the first of these exceptions—former testimony—which is defined as "[t]estimony given as a witness at another hearing of the same or a different proceeding * * * if the party against whom the testimony is now offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. Testimony given at a preliminary hearing must satisfy the right to confrontation and exhibit indicia of reliability." To be admitted at trial, the former testimony "must meet the following requirements: (1) it must be testimony given by a witness; (2) at a previous hearing, regardless whether it is the same matter or not; (3) the party against whom the testimony is being offered must have had an opportunity to cross-examine the witness; (4) the cross-examination must have satisfied the right to confrontation; and (5) must appear to be reliable testimony." *State v. Hairston,* 10th Dist. No. 08AP-735, 2009-Ohio-2346, ¶ 33.

{¶ 141}    The defense objected to admission of the testimony, but not on hearsay grounds. The defense objected on grounds that it crafted its questions at the Evid.R. 804(B)(6) hearing with the understanding that the testimony would not be used as "substantive evidence" at trial. (Tr. at 636). The prosecutor responded that it sought to admit the testimony to prove consciousness of guilt. The prosecutor averred that if the case were tried to a jury, the prosecutor would have recalled the witnesses at trial; however, since the case was tried to the bench, recalling the witnesses was unnecessary because the trial court "already heard the testimony previously." (Tr. at 637, 638). The trial court admitted the testimony for purposes of showing consciousness of guilt and indicated it would assign it the appropriate value. The trial court permitted the defense to proffer any additional questions it would have asked the witnesses. Despite this opportunity, the defense

proffered no additional questions, and it did not call either Hughes or Vass as defense witnesses at trial.

{¶ 142}     As noted above, objection on one ground does not preserve other, unmentioned grounds.  *Hairston*, 10th Dist. No. 15AP-1013, 2016-Ohio-8495, at ¶ 34. Thus, appellant's unavailability argument is reviewed for plain error.  *State v. Neyland,* 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 176 (failure to object on the basis of unavailability constitutes waiver).

{¶ 143}     Assuming that the prosecution could not have shown unavailability, there is no reason to believe, and appellant does not argue, that Hughes and Vass would have testified any differently at trial than they did at the Evid.R. 804(B)(6) hearing. Despite having the opportunity to do so, the defense did not identify any line of questioning it would have pursued at trial that it had not already pursued at the Evid.R. 804(B)(6) hearing. Further, as noted above, the trial court averred only that it would give the testimony the weight it deserved.  Nothing in the record establishes that the trial court even considered the testimony provided at the Evid.R. 804(B)(6) hearing in arriving at its verdicts.

{¶ 144}     Appellant also argues that the testimony at the Evid.R. 804(B)(6) hearing was inadmissible because the prosecution failed to establish that the anonymous threats to Jaw.L. were directed by appellant.  The defense did not raise this objection to the prosecution's request to admit the Evid.R. 804(B)(6) hearing testimony as trial evidence; as such, appellant has forfeited all but plain error.

{¶ 145}     Appellant has not demonstrated plain error.   We have already determined that the evidence establishes that the threatening letter Jaw.L. received was written by appellant. As such, it is relevant to show consciousness of guilt. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815,  ¶ 68 ("[e]vidence of conduct designed to impede or prevent a witness from testifying is admissible to show consciousness of guilt"); *State v. Berry*, 10th Dist. No. 16AP-659, 2017-Ohio-1529, ¶ 38 ("Berry's attempt to have J.J. kidnapped by 'Smitty,' is * * * consistent evidence of consciousness of guilt."). Further, appellant fails to show prejudice.  Even if appellant did not authorize the anonymous threats referenced at the hearing, nothing in the record establishes that the trial court based its verdicts on any evidence from the Evid.R. 804(B)(6) hearing that was not probative of appellant's guilt.

{¶ 146} The fifth assignment of error is overruled.

{¶ 147} Appellant's sixth assignment of error asserts that the trial court failed to conduct the four-part analysis required by *Barker v. Wingo,* 407 U.S. 514 (1972) in denying his motion to dismiss on constitutional speedy-trial grounds.

{¶ 148} Appellant was indicted on December 28, 2017 on multiple felonies. He entered a plea of not guilty, and trial was scheduled for January 29, 2018. Thereafter, the trial court ordered multiple continuances in 2018 based on either joint motions of the parties or appellant's individual motions. Trial was then set for March 4, 2019. On January 7, 2019, appellant filed a motion to dismiss the indictment, arguing that the state had violated his statutory and constitutional right to a speedy trial by failing to commence trial within 270 days of the indictment. The state opposed the motion. The trial court did not hold a hearing. In a decision and entry issued February 8, 2019, the trial court, after enumerating the various continuances filed in the case, stated as follows:

> All continuances in this matter have been either at the request of the Defendant or jointly made by the parties. In each instance, Defendant waived his right to a speedy trial during the period of the continuance. The Court finds such waivers to be effective. Accordingly, calculating the days from the indictment, and not including the time of the continuances, only 62 days have passed. This amount does not account for any time tolled pursuant to statute, and is clearly less than the 270 days set forth in R.C. 2945.71. Accordingly, the Court declines to presume any prejudicial impact of the delay. The Court further declines to find that 62 days between the indictment and trial date constitutes a denial of Defendant's right to a speedy trial.

(Feb. 8, 2019 Decision & Entry at 3.)

{¶ 149} "Generally, an appellate court's review of a trial court's decision regarding a motion to dismiss based upon a violation of speedy trial provisions involves a mixed question of law and fact." *State v. Squillace,* 10th Dist. No. 15AP-958, 2016-Ohio-1038, ¶ 11, citing *State v. Watson,* 10th Dist. No. 13AP-148, 2013-Ohio-5603, ¶ 12, citing *State v. Fultz,* 4th Dist. No. 06CA2923, 2007-Ohio-319, ¶ 8. "We must give due deference to a trial court's findings of fact if supported by competent, credible evidence, but we must independently review whether the trial court properly applied the law to the facts of the case." *Squillance* at ¶ 11, citing *Fultz* at ¶ 8.

{¶ 150}        Appellant argues that the trial court erred in failing to enter more detailed factual findings consistent with the four-part test set forth in *Barker* for resolving a constitutional speedy-trial claim.  Under that test, a trial court must balance four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of a speedy-trial right, and (4) prejudice to the defendant.  *State v. Triplett*, 78 Ohio St.3d 566, 568, (1997), citing *Barker* at 530.

{¶ 151}        At the outset, we note that Crim.R.12(F), which requires a trial court to state its essential findings on the record when factual issues are involved in determining a motion, "is not self-executing."  *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 112. "If a defendant does not request findings of fact, any error is forfeited."  *Id.*, citing *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 47.  Because appellant did not request that the trial court make any additional findings, he forfeited all but plain error.

{¶ 152}        On this record, appellant cannot show plain error.  The trial court was not required to issue findings of fact before rejecting appellant's constitutional and statutory speedy-trial claims.  "Crim.R. 12(F) requires a court to make findings of fact only '[w]here factual issues are involved in determining a motion.' "  "A court is not required to make findings of fact when the evidence is undisputed."  *Id.* at ¶ 114, quoting *Bauer v. Cleveland Ry. Co.,* 141 Ohio St. 197, 203 (2015).  The facts required to resolve appellant's claims were not in dispute.  Moreover, even if the delay between the indictment and the motion to dismiss (slightly over one year) was sufficient to trigger a constitutional speedy-trial analysis, the continuance entries alone defeat any constitutional speedy-trial claim. *State v. Williams,* 8th Dist. No. 108275, 2020-Ohio-269, ¶ 50-53 (no constitutional speedy-trial violation when almost all of the continuances were the result of the defendant's actions).  Here, appellant does not challenge the trial court's attribution of the continuances to appellant or its calculation that, not including the time attributed to the continuances, only 62 days passed between the indictment and the trial date. No additional findings were necessary.

{¶ 153}        The sixth assignment of error is overruled.

{¶ 154}        In his seventh and final assignment of error, appellant contends that he was denied the effective assistance of trial counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.  We disagree.

{¶ 155} In considering claims of ineffective assistance of counsel, courts " 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101, quoting *Strickland v. Washington,* 466 U.S. 668, 689. A verdict adverse to a criminal defendant is not of itself indicative of ineffective assistance of trial counsel. *In re J.J.A.,* 10th Dist. No. 09AP-242, 2010-Ohio-672, ¶ 14, citing *State v. Hester,* 45 Ohio St.2d 71, 75 (1976).

{¶ 156} To establish a claim of ineffective assistance of counsel, appellant must satisfy a two-prong test. First, he must show that counsel's performance was so deficient that it was unreasonable under prevailing professional norms. *Strickland* at 687-88. If appellant can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id.* To show prejudice, he must establish that there is a reasonable probability that but for his counsel's unprofessional errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* at 694.

{¶ 157} In analyzing a claim of ineffective assistance of counsel, an appellate court need not address the two prongs of an ineffective assistance claim in the order set forth in *Strickland. State v. Gibson,* 11th Dist. No. 2007-P-0021, 2007-Ohio-6926, ¶ 26, citing *State v. Jackson,* 11th Dist. No. 2002-Ohio-27, 2004-Ohio-2442, ¶ 9. Thus, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant resulting from the alleged deficiencies. *Id.* "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.,* citing *Jackson* at ¶ 11, citing *Strickland* at 697.

{¶ 158} Appellant contends his trial counsel was ineffective in (1) failing to object to the trial judge presiding over the certification hearing, (2) failing to request that appellant be apprised of the judge's involvement in the certification hearing prior to the reaffirmance of his jury waiver, (3) failing to object to the prosecutor's use of leading questions during the forfeiture by wrongdoing hearing, and (4) failing to object to the testimony and photograph regarding appellant's prior possession of a handgun and the

testimony about appellant's participation in a pattern of gang-related criminal conduct. Appellant contends that counsel's errors cumulatively undermine confidence in the outcome of the trial. We disagree.

{¶ 159}     We have already concluded that appellant was not prejudiced by the trial judge presiding over the certification hearing, the circumstances surrounding his reaffirmance of his jury waiver, or the admission of the evidence pertaining to his prior possession of a handgun and participation in gang-related criminal conduct. As to appellant's remaining contention, i.e., the failure to object to the prosecutor's use of leading questions at the forfeiture by wrongdoing hearing, we note that "Evid.R. 611(C) does not preclude the use of leading questions on direct examination; instead, the rule provides that 'it is within the trial court's discretion to allow leading questions on direct examination.' " *State v. Williams*, 4th Dist. No. 15CA3, 2016-Ohio-733, ¶ 34, quoting *State v. Jackson,* 92 Ohio St.3d 436, 449 (2001). As such, the failure to object to a prosecutor's leading questions does not constitute ineffective assistance of counsel. *Id.*, citing *Jackson.* Moreover, even if appellant's trial counsel had objected to the prosecutor's leading questions and the trial court had sustained the objections, it is likely that the prosecutor would have elicited the same testimonial evidence from Hughes and Vass through further questioning. We thus reject appellant's contention in the absence of any showing of prejudice.

{¶ 160}     The seventh assignment of error is overruled.

{¶ 161}     Having overruled all seven of appellant's assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER and MENTEL, JJ., concur.

————————————